**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No.**      12-cv 0041 – PAB-MJW

|  |  |
|---|---|
|  | : |
| ARCHANGEL DIAMOND CORPORATION LIQUIDATING TRUST | : |
|  | : |
|  | : |
| Plaintiff, | : |
| v. | : |
| OAO LUKOIL, | : |
|  | : |
| Defendant. | : |

**PLAINTIFF ARCHANGEL DIAMOND CORPORATION LIQUIDATING TRUST'S
OPPOSITION
TO DEFENDANT OAO LUKOIL'S MOTION TO DISMISS[1]
AND REQUEST FOR ORAL ARGUMENT**

---

[1] Docket No. 29.

### TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

PROCEDURAL BACKGROUND......................................................................................1

FACTS ............................................................................................................................4

JURISDICTIONAL FACTS................................................................................................5

ARGUMENT ...................................................................................................................5

    I.     THE COMPLAINT SHOULD NOT BE DISMISSED
          AS DUPLICATIVE LITIGATION ........................................................5

          A. ADC HAS NOT SPLIT CLAIMS ....................................................5

          B. THIS COURT SHOULD FULFIL ITS "VIRTUALLY UNFLAGGING
              OBLIGATION" TO EXERCISE JURISDICTION...........................7

    II.    ADC STATES CLAIMS UNDER RICO AND COCCA.......................9

          A. RICO AND COCCA APPLY EXTRATERRITORIALLY ..............9

              1.   RICO's Text Contains A "Clear Indication Of An Extraterritorial
                    Application".............................................................................10

              2.   RICO's Context Confirms Its Extraterritoriality .................13

          B. EXTRATERRITORIAL APPLICATION IS NOT AT ISSUE......................15

          C. ADC HAS STANDING TO BRING ITS CLAIMS........................16

    III.   THE COMPLAINT SHOULD NOT BE DISMISSED FOR LACK OF
          PERSONAL JURISDICTION................................................................17

          A. LUKOIL IS SUBJECT TO SPECIFIC JURISDICTION UNDER
              *CALDER* BASED ON THE RICO CLAIMS ................................17

              1.   The *Calder* "Effects Test" For Torts ...................................18

              2.   ADC Satisfies The Three-Prong *Calder* Test ......................18

              3.   The Colorado Court Decision Does Not Preclude This Court
                    From Finding Specific Jurisdiction In Colorado Under RICO............20

B.  LUKOIL IS SUBJECT TO JURISDICTION UNDER RULE 4(K) ..............20

　　　1.  Lukoil's U.S. ADR Program.................................................21

　　　2.  Lukoil's U.S. Real Estate...................................................22

　　　3.  Lukoil's U.S. Gas Station Network ....................................23

　　　4.  Lukoil's U.S. Trademarks And Marketing ..........................24

　　　5.  Lukoil's U.S. Credit Card Program ....................................25

　　　6.  Lukoil's U.S. Ex-Im Bank Business...................................25

　　　7.  Lukoil's U.S.-Based Global Trading Business ....................26

C.  LUKOIL IS SUBJECT TO GENERAL JURISDICTION BASED
　　ON ITS *DE FACTO* COLORADO OFFICE FROM
　　DECEMBER 1, 2001 ONWARD ...............................................26

D.  LUKOIL DOES NOT MAKE A "COMPELLING CASE"
　　JURISDICTION WOULD BE UNCONSTITUTIONALLY
　　UNREASONABLE.....................................................................29

E.  ADC IS ENTITLED TO DISCOVERY TO THE EXTENT
　　IT HAS NOT ESTABLISHED A *PRIMA FACIE* CASE OF
　　PERSONAL JURISDICTION UNDER RULE 4(k)(2) OR
　　RELATED TO DSE...................................................................31

F.  THIS COURT SHOULD DEFER FINAL DECISION ON
　　PERSONAL JURISDICTION TO TRIAL ...................................31

IV.  THE COMPLAINT SHOULD NOT BE DISMISSED FOR *FORUM NON*........32

A.  FORUM NON MUST BE DENIED BECAUSE U.S. LAW APPLIES .........33

B.  ADC'S CHOICE OF FORUM IS ENTITLED TO SUBSTANTIAL
　　DEFERENCE ...........................................................................33

C.  LUKOIL HAS NOT ESTABLISHED THAT THE PRIVATE INTEREST
　　FACTORS ESTABLISH "OPPRESSIVENESS AND VEXATION"............34

D.  LUKOIL HAS NOT MET ITS BURDEN THAT THE PUBLIC
　　INTEREST FACTORS HEAVILY FAVOR DISMISSAL TO RUSSIA.......36

E.  RUSSIA IS NOT AN ADEQUATE FORUM FOR THIS DISPUTE.............38

V.       THE NON-FEDERAL CLAIMS SHOULD NOT BE OTHERWISE
         BE DISMISSED BECAUSE THEY ARE NOT PENDENT ...............................38

CONCLUSION.........................................................................................................................39

Certificate of Service ................................................................................................................40

## INTRODUCTION

This case has direct and substantial ties to Colorado.   In 1997, Archangel Diamond Corporation ("ADC") moved its principal place of business to Colorado, employing numerous Colorado residents.   In 1998, OAO Lukoil ("Lukoil"), knowing ADC was in Colorado, acquired control of Arckhangelskgeoldobycha  ("AGD") and engaged in an open-ended, multi-year pattern of racketeering in violation of RICO, 18 U.S.C. §1961 *et seq*. and Colorado law from 1998 onward, committing an "Illegal Scheme" involving over 75 predicate acts of mail and wire fraud which ADC received and relied upon in Colorado, causing damage to ADC, loss of many Colorado jobs, and ultimately ADC's bankruptcy.   ADC's most important witnesses – former CEO Haddon and CFO Davis -- still reside in Colorado.   Given the RICO claims, this Court applies a more favorable personal jurisdiction standard under the Fifth Amendment and Fed.R.Civ.P. 4(k)(2) than Colorado, and, even without RICO, now considers ten more years of Lukoil's Colorado contacts than the state court, which limited contacts to the date of ADC's 2001 complaint.   This Court should fulfill its "virtually unflagging obligation" to exercise jurisdiction under *Colorado River Cons. Water Dist. v. United States,* 424 U.S. 800, 822 (1976).

## PROCEDURAL BACKGROUND[1]

**Five + Years, No Discovery:**  In November, 2001, ADC filed claims against Lukoil and AGD. They removed to avoid Colorado's "most unusual circumstances" *forum non* test, but the case was remanded for lack of subject matter jurisdiction.  In October, 2002, Judge Robbins dismissed, (1) holding *sua sponte* ADC could not assert tort claims based on the "economic loss rule", thus not considering tort based specific personal jurisdiction, and (2) weighed evidence regarding Lukoil's Glendale station as to general jurisdiction.   No discovery was permitted.

---

[1] ADC's exhibits are attached to the Third Declaration of Maria Temkin ("T. Dec.").

*Archangel Diamond Corp. v. Arkhangelskgeoldobycha*, 94 P.3d 1208 (Colo. Ct. App., 2004) affirmed only as to lack of personal jurisdiction, failing to address specific jurisdiction against Lukoil.  *Archangel Diamond Corp. v. OAO Lukoil,* 123 P.3d 1187 (Colo. 2005) ("*Archangel*") reversed for lack of general personal jurisdiction in regard to Lukoil, given the Glendale station.[2]  It affirmed dismissal against AGD for lack of specific personal jurisdiction based on its determination ADC "unilaterally" caused AGD to deal with it in Colorado by moving and applied this same logic to Lukoil.  Upon remand, A*rchangel Diamond Corp. v. Arkhangelskgeoldobycha*, 2006 Colo. App. LEXIS 1055 (June 29, 2006) rejected Lukoil's *forum non* argument, finding ADC maintained its principal place of business in Colorado at all relevant times.  The Colorado Supreme Court denied Lukoil's petition for review.

**Post-Remand Litigation – One Subpoena and Deposition:**  In March, 2007, the case was finally remanded to the district court.  Judge Rappaport granted jurisdictional discovery, but the matter was then informally stayed until early 2009, pending settlement efforts.  In May, 2009, in granting ADC's motion to compel discovery, Judge Mansfield accepted Lukoil's argument that the court could only consider jurisdictional contacts through the date of ADC's complaint, i.e. November, 2001.  *See* T. Dec., Ex. O.  By now insolvent due to the litigation against AGD and Lukoil, ADC was placed into bankruptcy in June, 2009 and its claims assigned to the Plaintiff. Meanwhile, in 2009, ADC subpoenaed invoices from Colorado based DS Engineering, Inc. ("DSE") and deposed its nominal owner, Dean Sillerud – the only DSE related discovery.[3] Based on this limited discovery, ADC amended its complaint to add claims under RICO and the

---

[2] Post-remand discovery revealed Lukoil no longer operated the station when ADC filed suit in 2001. Thus, ADC did not rely on it for general jurisdiction in 2011.

[3] Judge Mansfield issued an oral order prohibiting ADC from questioning Sillerud regarding "new business" which DSE did with Lukoil after ADC's complaint was filed, as set forth by Lukoil's attorney at the deposition, T. Dec., Ex. A, at 5-6.  Thus, ADC was not permitted discovery of any new DSE business with Lukoil beyond November, 2001.

Colorado analogue, Colo.R.Stat. §18-17-101 *et seq*. ("COCCA") and allegations that DSE served as Lukoil's *de facto* Colorado office based on agency/*alter ego* theories.

**Removal to the Bankruptcy Court:** On November 25, 2009, ADC removed the Amended Complaint to the Bankruptcy Court pursuant to 28 U.S.C. §1452 in order to <u>avoid</u> the risk of duplicate proceedings, recognizing that if the Colorado court dismissed for lack of personal jurisdiction under its "long arm statute" and the Fourteenth Amendment, ADC would re-file in this Court, which applies the Fifth Amendment standard, including the aggregation of Lukoil's national contacts under Rule 4(k)(2).   Discovery was stayed at Lukoil's motion and, despite ADC's argument, Judge Tallman remanded the matter on October 28, 2010.

**Dismissal:**   On remand, ADC submitted former CEO Haddon's declaration that ADC moved to Colorado in 2007 <u>before</u> Lukoil took over AGD in 2008, thus showing that *Archangel's* concern that ADC dragged AGD into dealing with it in Colorado did not apply to Lukoil.  By orders dated October 20, 2011, Judge Hood dismissed for lack of personal jurisdiction, denying any discovery related to DSE.   ADC's pending appeal asserts, *inter alia,* the court erroneously: (1) applied the "purposefully availed itself of doing business" test, which applies to contract based jurisdiction, instead of the "purposely directed" test established for torts by *Calder v. Jones*, regarding specific jurisdiction; (2)  held that ADC had not made a *prima facie* showing that DSE was Lukoil's agent/*alter ego* by weighing the evidence without a hearing, including Lukoil attorney Zubkov's 2010 hearsay affidavit which it *sua sponte* converted into an expert affidavit, regarding general jurisdiction; and (3) imposed the burden of whether jurisdiction comported with "fair play and substantial justice" on ADC.  *See* T. Dec., Ex. 66, at 6-8; 12-15.

**Re-Filing In this Court:**  On January 6, 2011, ADC re-filed its claims within the 90 days provided by C.R.S. 13-80-111, Colorado's savings statute, to preclude a limitations defense.

## **FACTS**

In 1993, ADC entered into an agreement supplemented in 1994 (the "Agreement") with state entity AGD which was bidding for a diamond exploration/development license (the "License").   In return for ADC serving as its sole source of finance, AGD agreed to transfer the License to a jointly-owned company in which ADC would have a 40% interest.   AGD won the License and ADC provided funds.   In 1996, AGD discovered diamonds worth billions.   AGD was then privatized, taken over by oligarch Alisher Usmanov in 1996-97 and then Lukoil in 1998.   Complaint ("Compl."), ¶¶2-4 (Docket No. 1).

By February, 1997, ADC established Colorado as its financial center where acting CFO Davis resided, and, by November, 1997, hired Haddon as its CEO and moved its principal office to Colorado where it employed numerous Colorado residents.  Compl., ¶¶4, 45-49.   In December, 1997, Haddon informed AGD that ADC had moved to Colorado.  Lukoil did not acquire AGD and elect its people to the AGD board until April, 1998. Compl., ¶¶4, 13, 44-46.

After taking control of AGD, knowing ADC was in Colorado, Lukoil engaged in an "Illegal Scheme" involving a pattern of racketeering in violation of the mail and wire fraud statutes, directing over 75 fraudulent communications to Colorado in order to induce ADC to invest in development of the License by purporting to honor the Agreement to transfer the License, including directing AGD to enter into the "1999 Agreement" to do so.  Compl., ¶¶4, 49, 57-61, 108.   In fact, Lukoil never intended AGD would transfer the License.  Compl., ¶¶4-5, 38-55, 150, 155.   ADC relied on these false representations, causing substantial harm, loss of many Colorado jobs, and ADC's bankruptcy.  Compl., ¶¶103, 149-50.  Lukoil also engaged in other racketeering schemes, including "Cash Smuggling" as related to DSE. Compl., ¶¶76-78, 89, 94-97, 105,110.

4

## JURISDICTIONAL FACTS

Lukoil has vast nationwide contacts with the U.S. Compl., ¶26, and operated DSE as its agent/*alter ego* in Colorado for years. Compl.,¶¶ 19-25, 74-86.   Lukoil's nationwide contacts, including its (A) ADR's; (B) U.S. Real Estate; (C) U.S. Station Network; (D) U.S. Trademarks and Marketing; (E) U.S. Credit Card Program; (F) U.S. Ex-Im Bank Business; and (G) U.S. Global Oil Trading Business, are described in the Motion for Jurisdictional Discovery (Docket No. 43).   Lukoil's relationship with DSE is described in the Motion for Jurisdictional Discovery Related to DSE (Docket No. 41).   Relevant excerpts from these motions (Addendums C and D) and ADC's evidentiary exhibits are attached to Maria Temkin's Declaration.   ADC will provide a CD linking the addendums and exhibits to this brief to assist the Court.

## ARGUMENT

### I.   THE COMPLAINT SHOULD NOT BE DISMISSED AS DUPLICATIVE LITIGATION

#### A.   ADC HAS NOT SPLIT CLAIMS

ADC was <u>required</u> to file suit within the 90 days provided by C.R.S. 13-80-11 to preclude a limitations defense.   Dismissing for claims splitting would render the savings statue meaningless.   This case represents claims saving, not claims splitting.   Beyond this, Tenth Circuit "precedent cannot be clearer: the test for claim splitting is … whether the first suit, assuming it were final, would preclude the second suit." *Katz v. Girardi*, 655 F.3d 1212, 1218 (10th Cir. 2011).   The state court decision does not preclude this case.

<u>First</u>, "in federal question cases, personal jurisdiction flows from the Due Process Clause of the Fifth Amendment." *Peay v. Bellsouth Med. Assistance Plan*, 205 F.3d 1206, 1210 (10th Cir. 2000).   Thus, when "a federal statute provides the basis for jurisdiction, the constitutional limits of due process derive from the Fifth, rather than the Fourteenth, Amendment." *Peay,*

*supra.* *(quoting Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997)).[4]   Given the RICO claims, this Court decides personal jurisdiction under the Fifth Amendment.   Colorado's interpretation of its "long arm statute" and the Fourteenth Amendment – right or wrong -- is irrelevant to this Court's interpretation of the Fifth Amendment.   More importantly, Colorado was limited to considering Lukoil's ties to Colorado; this Court may assess Lukoil's nationwide ties pursuant to Fed.R.Civ.P. 4(k)(2).

Second, assuming, *arguendo*, the RICO claims fail, this Court has diversity jurisdiction because the ADC is a Colorado citizen based on the citizenship of its sole trustee Ed Cordes, *Navarro Savings Assn. v. Lee*, 446 U.S. 458, 465-466 (1980) (trust's citizenship is that of trustee), and Lukoil is a citizen of a foreign state.   Lukoil successfully argued in Colorado that jurisdiction was limited to contacts as of the date of filing and admits its state court position in its Motion to Dismiss, at 12-13, fn. 6 (Docket No. 29).   Lukoil is judicially estopped from changing its position.   *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position").

Taking Lukoil's position, ADC is entitled to base jurisdiction on agency/*alter ego* facts from December 1, 2001 through January, 2012, adding over <u>ten</u> years of contacts between DSE and Lukoil to the mix.   Importantly, beginning in 2002, DSE serviced an additional <u>four</u> Lukoil companies beyond Lukoil AIK  – (a) Lukoil Western Siberia (2002); (b) NMNG (2003); (c)

---

[4] Although factors used in determining personal jurisdiction under the Fourteenth Amendment may be considered when applying the Fifth Amendment, "[c]ourts should not, however, apply these factors mechanically in cases involving federal statutes because the due process concerns of the fifth and fourteenth amendments are not precisely parallel." *Republic of Panama*, 119 F.3d at 946 (citation omitted).   "[T]he fact that the United States is the sovereign asserting its power undoubtedly must affect the way the constitutional balance is struck." *Id.* at 945.

Tsurant (2003); and (d) Langepas (2003), T. Dec., Ex. D – and began to be paid directly by Lukoil Israel, Ltd. in January, 2005.  In short, the jurisdictional facts are different.  *Pohlmann v. Bil-Jax, Inc.*, 176 F.3d 1110, 1112 (8th Cir. 1999) ("personal jurisdiction is time sensitive in each case.  The issue of personal jurisdiction [at the time of the] first suit on November 1993 is not identical to the issue whether that court had personal jurisdiction over [defendant] when the second suit was filed in December 1997"); *Eaton v. Weaver Mfg. Co.*, 582 F.2d 1250, 1256 (10th Cir. 1978) (affirming dismissal based on the facts, but holding "suit may be brought again where a jurisdictional defect has been cured or loses its controlling force").

ADC recognized the differing standards when removing and argued in the Bankruptcy Court that it would be wasteful to remand the matter because if Colorado did not sustain jurisdiction, ADC would re-file the matter in federal court, as it has done.   To the extent that Lukoil is facing litigation in both courts,  this is its own making, albeit the Colorado appeal involves no more than filing a brief), hardly a significant burden.

**B.     THIS COURT SHOULD FULFILL ITS "VIRTUALLY UNFLAGGING OBLIGATION" TO EXERCISE JURISDICTION**

Federal courts have a "virtually unflagging obligation" to hear cases within their jurisdiction, *Colorado River*, and may only dismiss or stay because of parallel state proceedings under "exceptional circumstances."  *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25-26 (1983) (reversing dismissal).   "*Moses H. Cone* [admonishes] that to grant a stay or dismissal under the *Colorado River* doctrine would be 'a serious abuse of discretion' unless 'the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issue between the parties. . . . The decision to invoke *Colorado River* necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses.' 460 U.S. at 28." *Fox v. Maulding*, 16

F.3d 1079, 1081-82 (10th Cir. 1994) (reversing dismissal).   "The Supreme Court has set forth a number of factors for a court to consider in determining whether 'exceptional circumstances' exist.  Before examining these factors, however, a federal court must first determine whether the state and federal proceedings are parallel."  *Id.* at 1082 (emphasis added).

First, the cases are not parallel because this Court applies different standards (Fifth Amendment, nationwide contacts, different time period) than Colorado courts, as explained above.   This is dispositive.   There is no vexation or impermissible forum shopping in re-filing its claims pursuant to the savings statute to obtain personal jurisdiction here.

Second, although irrelevant given the absence of parallel proceedings, the *Colorado River* factors support ADC, including (1) there is no *res* at issue; (2) the federal forum is no more inconvenient than the state forum; and (3) federal RICO governs ADC's main claim. There will be no "piecemeal litigation" because if ADC prevails here, it can stay the Colorado action.[5]

Third, again irrelevant given the absence of parallel proceedings, Colorado courts have demonstrated an inability to promptly protect ADC's rights.   In 2002, Judge Robbins (1) *sua sponte* dismissed ADC's tort claims based on the "economic loss" doctrine, never considering specific jurisdiction, and (2) improperly weighed the evidence concerning Lukoil's Glendale station as to general jurisdiction.   No discovery was provided.   It took the Colorado appellate courts until 2007 to correct these errors.   In 2011, in dismissing, Judge Hood committed the errors set forth above, including yet another *sua sponte* ruling.   No discovery of Lukoil regarding DSE was permitted.   While this Court does not sit in judgment of the state court, at the same

---

[5] *Colorado River* discussed these factors.  *Id. at 818.  Moses H. Cone* added factors such as the vexatious or reactive nature of the federal or the state action, 460 U.S. at 18 n.20; whether federal law provides the rule of decision, *id.* at 23; and the adequacy of the state court action to protect the federal plaintiff's rights, *id.* at 28.   Other courts have considered whether the party opposing abstention has engaged in impermissible forum-shopping.

time, under *Colorado River*, it should not defer its own jurisdiction, especially given the series of errors over many years by Colorado courts.

*Elmendorf Grafica, Inc. v. D.S. America*, 48 F.3d 46 (1st Cir. 1995) addressed this exact procedural posture, reversing a decision to stay pending appeal of dismissal for lack of personal jurisdiction in state court. *Elmendorf* found no "exceptional circumstances," holding:

> This was not a case where the parallel state action was strongly underway . . . . Here, if the . . . court's dismissal for lack of personal jurisdiction should be affirmed by the Illinois Appellate Court, there will be left in existence no state action whatever; while if the lower court's dismissal should be reversed on appeal, the parties will merely be back at the very beginning of the process of litigating the merits of their controversy …[ F]orcing the plaintiff in the federal case to sit on its hands for so long is not consonant with *Colorado River* and its progeny, which describe the balance as 'heavily weighted in favor of the exercise of [federal court] jurisdiction.

*Id*. at 51 (internal citations and quotations omitted, emphasis added).

In short, this ten + year old case – where there has been no personal jurisdictional discovery regarding DSE other than the subpoena on DSE and Sillerud's deposition and no merits discovery in Colorado -- is likely to be tried to verdict in federal court before Colorado resolves the appeal.  ADC would suffer great prejudice, including loss of witnesses and memory if forced to wait out the Colorado appeals process --  which previously took five years –  and, if unsuccessful, would bring ADC back to this Court.

## II.      ADC STATES CLAIMS UNDER RICO AND COCCA

Lukoil's Rule 12(b)(6) motion does not challenge the adequacy of ADC's pleading or factual allegations supporting these claims.  Rather, it argues only RICO does not apply extraterritorially, ADC's claims require extraterritorial application, and ADC lacks standing because it was not harmed by the "Cash Smuggling Scheme".   These arguments fail.

### A.      RICO AND COCCA APPLY EXTRATERRITORIALLY

Prior to *Morrison v. Nat'l Australia Bank, Ltd.*, 130 S. Ct. 2869 (2010), courts generally applied RICO to claims involving extraterritorial conduct, including *Southway v. Central Bank of Nigeria,* 198 F.3d 1210 (10th Cir. 2000) (upholding RICO claims based on mail and wire fraud directed to U.S. residents from Nigeria).[6]   *Morrison* does not change this because it specifically held that the "presumption against extraterritoriality … [imposes no] requirement that a statute say 'this law applies abroad'" for it to apply extraterritorially, *id*. at 2877; rather, courts need only determine that "there is the affirmative intention of the Congress" expressed through the statute's text and context that it applies extraterritorially. *Id*. at 2883.   The guides for this task "must be the text of the statute and its legislative history." *H.J. Inc. v. Northwest Bell Tel. Co.*, 492 U.S. 229, 236 (1989).  Importantly, "RICO is to be read broadly.   This is the lesson not only of Congress's self-consciously expansive language and overall approach . . . but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes…' 4 Stat. 947." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985).[7]   ADC has provided Addendums A and B and RICO's legislative history to assist the Court. Adds. A, B; Exs. 59-60.

### 1.   RICO's Text Contains A "Clear Indication Of An Extraterritorial Application"

First, each of RICO's sections 1962(a)-(d) makes it unlawful to engage in a "pattern of racketeering activity," 18 U.S.C. § 1962, and "racketeering activity" specifically includes more

---

[6] *E.g., Liquidation Comm'n of Banco Intercontinental, S.A. v. Alvarez Renta,* 530 F.3d 1339, 1351-52 (11th Cir. 2008) ("RICO may apply extraterritorially if conduct material to the completion of the racketeering occurs in the United States, or if significant effects of the racketeering are felt here."); *John Doe I v. Unocal Corp.*, 395 F.3d 932, 961-962 (9th Cir. 2002) ("The 'conduct' test establishes jurisdiction for *domestic conduct that directly causes foreign loss or injury*." Conversely, the "effects" test establishes jurisdiction for *foreign conduct that directly causes domestic loss or injury*.") (emphasis in original).

[7] Interpretation of COCCA is the same. *People v. Chausse*, 880 P.2d 749, 754 (Colo. 1994) (COCCA's legislative purpose closely parallels RICO); C.R.S. §18-17-108 ("the provisions of [COCCA] shall be liberally construed.").

than 70 racketeering acts that facially apply to extraterritorial conduct, *id.* § 1961(1).  *See* T. Dec.

Add. A.  Notably, if one statute piggybacks on a different, extraterritorial one, the former also

applies extraterritorially, even if silent on the matter (which RICO is not).  *United States v.*

*Yousef*, 327 F.3d 56, 87-88 (2d Cir. 2003).   It would be anomalous that RICO does not apply

extraterritorially when some predicate acts can only be violated by extraterritorial conduct.[8]

Such an interpretation would render Congress' inclusion of such predicate acts meaningless.

Second, each of RICO's substantive sections 1962(a)-(d) applies to "any enterprise which

is engaged in, or the activities of which affect, interstate *or foreign* commerce."  18 U.S.C.

§ 1962 (emphasis added).  The breadth of RICO's application is emphasized by the term "any"

in this section, *Boyle v. United States,* 129 S. Ct. 2237, 2243 (2009), and the term "foreign

commerce" in RICO's substantive provisions, as opposed to a definitional section, as in the

Exchange Act in *Morrison*, confirms Congress intended RICO to have extraterritorial

application.  Similarly, Congress's placement of the phrase "commerce . . . with foreign nations"

in the substantive provisions of the Sherman Act, 15 U.S.C. §6a -- on which RICO was modeled,

*Cory v. Aztec Steel Building, Inc.*, 468 F.3d 1226, 1232 (10th Cir. 2006)  -- was sufficient to

demonstrate its extraterritorial reach.  *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*,

370 U.S. 690, 694, 704-05 (1962).

The predicate act statutes invoked here –wire fraud (18 U.S.C. §1343),[9]  money

---

[8] *See, e.g.*, 18 U.S.C. § 32 (destruction of aircraft in overseas or foreign air commerce); 18
U.S.C. § 2332a (use of weapons of mass destruction against Americans or U.S. property abroad);
18 U.S.C. § 2332b (terrorism transcending national boundaries); 18 U.S.C. § 2339B (supporting
foreign terrorist organizations); and 18 U.S.C. § 2339C (financing terrorism abroad).

[9] *Pasquantino v. United States*, 544 U.S. 349, 372 (2005) held §1343's statutory language
establishes that "this is surely not a statute in which Congress had only 'domestic concerns in
mind.'"  *Id.* at 371-72 (considering use of the term "wires . . . in interstate or foreign commerce"
in its substantive provision). *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003)

laundering (18 U.S.C. §1956), and the Travel Act (18 U.S.C. §1952) – expressly apply to foreign

commerce; the mail fraud statute (18 U.S.C. §1341) applies to anything "delivered by [U.S.]

mail … according to the direction thereon", regardless of whether it is sent from outside of the

U.S.  None of the cases cited by Lukoil analyze RICO under the *Morrison* standard, not

addressing that over 70 RICO predicate acts apply extraterritorially by definition or the inclusion

of "foreign commerce" in RICO's substantive sections. [10]  This Court should ask itself a simple

question:  If Congress did not intend RICO to apply extraterritorially to foreign defendants using

foreign enterprises to harm Americans, why would it have included predicate acts related to

international terrorism in amendments to RICO after 9/11, beginning in 2001?[11]  *See* T. Dec.,

Add. B.  It is not as if Al Queda consists of Americans operating Delaware enterprises.   While

ADC does not equate its harm to that caused by terrorism – the concept is the same – predicate

acts of RICO caused harm to American interests, and, instantly, in Colorado.

---

applied the wire fraud statute to wires from foreign countries which caused harm here by
corrupting the Salt Lake Olympics.

[10] Rather, Lukoil's cases based their reasoning on isolated pre-*Morrison* decisions.  For example,
*Norex Petroleum Ltd. v. Access Indus.*, 631 F.3d 29, 32-33 (2d Cir. 2010) considered itself bound
by pre-*Morrison  North South Finance Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996)
which held that "RICO is silent as to any extraterritorial application." *Norex*, therefore,
concluded that "we must presume it is primarily concerned with domestic conditions." *Id.* at 33
(*citing Morrison*).  Unlike the instant case, Norex was not based in the U.S. and its harm was not
felt here.  Similarly, *United States v. Philip Morris USA, Inc.*, 783 F.Supp. 2d 23, 29 (D.D.C.
2011) relied on its prior holding in *U.S. v. Philip Morris USA, Inc., et al.*, 477 F.Supp. 2d 191,
197 (D.D.C. 2007) that RICO is silent; *see also Cedeño v. Intech Group, Inc.*, 733 F.Supp.2d
471, 473 (S.D.N.Y. 2010) (same, *citing Al-Turki*); *In re Toyota Motor Corp.*, 785 F.Supp.2d 883,
913 (C.D. Cal. 2011) (same, *citing Al-Turki* and *Norex*).  No case cited by Lukoil conducted the
analysis required by *Morrison*.  RICO is far from silent on extraterritorial application.

[11] The "USA Patriot Act", 115 Stat. 382 (2001) added subsection G to §1961(1) which made
"any act that is indictable under any provision listed in section 2332(g)(5)(B)" of Title 18 a
predicate act.  Subsection G now contains over fifty offenses mainly dealing with international
terrorism as RICO predicate acts, including those added by the "Terrorist Bombing Convention
Implementation Act", 116 Stat 721, 728 (2002); the "Intelligence Reform and Terrorism
Prevention Act", 118 Stat. 3638, 3769, 3774 (2004); and the "Patriot Improvement and
Reauthorization Act", 120 Stat. 192, 209 (2005).

In sum, Congress's inclusion of patently extraterritorial racketeering acts and "foreign commerce" in RICO's substantive provisions are "clear statement[s] of extraterritorial effect," similar to the language in §30(a) of the Exchange Act that *Morrison* noted applied extraterritorially.  130 S. Ct. at 2883.

## 2.   RICO's Context Confirms Its Extraterritoriality

Consideration of what "Congress in fact thought about and conferred" when enacting RICO compels the conclusion that RICO applies extraterritorially.  *Morrison*, 130 S. Ct. at 2880.

 First, when RICO was enacted, Congress found America awash in organized crime activities that "seriously burden . . . *foreign commerce*."  84 Stat. 922 (1970) (emphasis added), T. Dec., Ex. 60.  Congress also observed "organized crime's operations are national and *international*."  Cong. Rec. Vol. 116, 819 (1970) (emphasis added), T. Dec., Ex. 59.  "Because many rackets are conducted by highly organized syndicates whose influence extends over State and *National borders*, the Federal Government should come to the aid of local law enforcement authorities."  *Id.* at 844 (emphasis added).  Congress even described international money laundering, referencing criminal organizations' ability to draw $50 million checks from "numbered" Swiss accounts.  *Id.* at 597.  T. Dec., Ex. 59.

Second, the criminal penalties in §1963 and the lengthy list of criminal statutes designated as racketeering activity in §1961(1) demonstrate that RICO is primarily a criminal statute.  This is important because extraterritorial application is inferred when interpreting criminal statutes.  As *United States v. Bowman,* 260 U.S. 94, 98 (1922) states, some offenses

are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed … in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include… foreign countries, but allows it to be inferred from the nature of the offense.

Third, RICO's "'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity" under §1964(c) to supplement the government's efforts.  *Sedima*, 473 U.S. at 497-98; *Southway,* 198 F. 3d at 1216.  There is no basis for interpreting violations of §1962 for civil use under §1964(c) more narrowly than criminal application under §1963; rather, the application of §1962 should be co-extensive in civil and criminal proceedings to empower "private attorney generals" to enforce RICO.   At a minimum, if this Court were to impose any extraterritorial limit, it should apply RICO under §1964(c) when the harm occurs in the U.S., as here.

Fourth, RICO does not present the contravening factors that *Morrison* found in §10(b) to warrant against extraterritorial application of the Exchange Act.  For example, *Morrison* expressed displeasure with the creation of "conducts or effects" extraterritoriality tests for §10(b) that "were not easy to administer."  130 S. Ct. at 2879.  No special test is necessary for RICO. Courts need merely determine if the enterprise is engaged in interstate or foreign commerce and if the complained of conduct of its affairs, even if occurring outside the U.S., is covered by the criminal statutes listing racketeering activity.   Further, even if an "effects" test would be difficult to administer under the Exchange Act, this exact test is applied under the anti-trust laws, *Continental Ore*, 370 U.S. 704-05 (upholding  application of Sherman Act because "activities of the defendants had an impact within the United States and its foreign trade"), on which RICO is modeled. *Cory, supra*.   At a minimum, Congress would want RICO to apply when harm is felt domestically, as with the Anti-Trust laws.  Also, with §10(b), because of competing national regulation of securities transactions, "[t]he probability of incompatibility with the applicable laws of other countries is so obvious" that *Morrison* concluded, "if Congress intended such foreign application, it would have addressed the subject of conflicts."  *Id*. at 2885.  That is not so

14

with RICO because the basis for RICO claims is criminal activity already proscribed.

### B. EXTRATERRITORIAL APPLICATION IS NOT AT ISSUE

Beyond a statute's extraterritorial application, *Morrison* requires examination of the "quite valid assertion" that the "presumption [against extraterritoriality] . . . is not self-evidently dispositive" by considering the statute's focus to determine whether the alleged domestic acts are is proscribed by the statute, even if some conduct occurs overseas. 130 S. Ct. at 2884. *Morrison* thereby carefully preserved *Pasquantino*, which established that extraterritorial application of the wire fraud statute was not implicated in a scheme to deprive Canada of customs revenues because the proscribed conduct fell "within the literal terms" of the statute, *i.e.*, use of the wires. 544 U.S. at 355. *Pasquantino* rejected outright that the wire fraud statute was being applied extraterritorially because the harm was felt in Canada:

> [O]ur interpretation of the wire fraud statute does not give it "extraterritorial effect"… Petitioners used U.S. interstate wires to execute a scheme to defraud a foreign sovereign of tax revenue. Their offense was complete the moment they executed the scheme inside the United States . . . This domestic element of petitioners' conduct is what the Government is punishing in this prosecution . . . In any event, the wire fraud statute punishes frauds executed "in interstate or foreign commerce" . . . so this is surely not a statute in which Congress had only "domestic concerns in mind."

*Id.* at 371-72 (citations omitted).

RICO's undeniable focus is a "pattern of racketeering activity," which is "the heart of any RICO complaint." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 150, 154 (1987). That pattern can be established by showing racketeering acts in the U.S., as established by *Pasquantino,* without implicating extraterritorial application. Here, as to the Illegal Scheme, Lukoil committed a pattern of racketeering in the U.S. through its use of the U.S. mails and wires. Compl., ¶¶87-89, 116-123, 130-134. While Lukoil may have been outside of the U.S., the use of the U.S. mails and wires by definition occurred in the U.S., all the same. Equally, ADC received the mail and wires in Colorado where it relied on the misrepresentations

15

to its detriment by wiring millions of dollars from its Colorado accounts.  Compl., ¶¶76-78, 91-100.

In *CGC Holding Company, LLC v. Hutchens*, 2011 U.S. Dist. LEXIS 126361 (D. Colo. Nov. 1, 2011), Judge Jackson held "the racketeering activity of the [Canadian] enterprise … which … was directed at … the United States … to extract money from CGC and the other plaintiffs through a phony loan scheme … [using] telephone, mail, and email communications directed to potential borrowers in the United States" did not constitute the extraterritorial application of RICO to Canadian defendants.  *Id*. at *39.  "Clearly, a corporate defendant that is a foreign entity is not for that reason alone shielded from the reach of RICO."  *North-South Finance Corp. v. Al-Turki*, 100 F.3d.1046, 1051 (2d Cir. 1996).   That its "brains" – as Lukoil argues – are located in Moscow does not lessen its use of U.S. mails and wires to defraud ADC to make payments from here just as the fraud in *CGC* induced plaintiffs to make payments from here to Canada.  Thus, under *Pasquantino*, extraterritoriality is not implicated.

### C.    ADC HAS STANDING TO BRING ITS CLAIMS

Lukoil argues that ADC lacks standing because it suffered no harm from its "Cash Smuggling Scheme."   Lukoil ignores the 75+ predicate acts of the Illegal Scheme harmed ADC, creating standing under RICO and COCCA.   In regard to the "Cash Smuggling Scheme," Lukoil erroneously conflates standing with allegations which are permissible to establish the continuity of Lukoil's pattern of racketeering under RICO. [12]

---

[12]*H.J. Inc. v. Northwest Bell Tel. Co.*, 492 U.S. 229, 239-240 (1989) held that a pattern of racketeering activity may be established by showing continuity.  In addition to pleading the multi-year Illegal Scheme, ADC made the Cash Smuggling allegations to establish continuity by pleading "multiple schemes" over many years and racketeering is "a regular way of conducting defendant's ongoing legitimate business," as permitted by *H.J.,* 492 U.S. at 240, 242.  Thus, these allegations are "highly relevant" to establishing that Lukoil committed a pattern of racketeering, as *H.J.* approves, even though unrelated to harm caused to ADC.  *Terminate Control Corp. v.*

## III.    THE COMPLAINT SHOULD NOT BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

Absent "an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction." *Ast Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056-1057 (10th Cir. 2008) (internal citations omitted).  "When evaluating the prima facie case, the court is bound to resolve all factual disputes in favor of the plaintiff in determining whether he has made the requisite showing." *Id.* at 1057 (internal citations omitted).  "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits…If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."  *Behagen v. Amateur Basketball Asso.*, 744 F.2d 731, 733 (10th Cir. 1984) (internal citations omitted).

### A.    LUKOIL IS SUBJECT TO SPECIFIC JURISDICTION UNDER *CALDER* BASED ON THE RICO CLAIMS

A court may "assert specific jurisdiction over a nonresident defendant if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Ast Sports,* 514 F.3d at 1058 (*citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  "Due process merely requires "fair warning that a particular activity may subject [defendants] to the jurisdiction of a foreign sovereign." *Burger King*, 471 U.S. at 472 (internal citations omitted).  "[T]his 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at

*Horowitz,* 28 F.3d 1335, 1347 (2d Cir.1994) teaches that "[a] pattern of racketeering activity may be based upon predicate acts directed against non plaintiffs as long as one act injures the plaintiff so as to create standing for that plaintiff."  *E.g. Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809, 810 (7th Cir.1987) ("a plaintiff attempting to prove … a pattern of racketeering activity may attempt to prove activities directed at a variety of victims").

residents of the forum … and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Id.*

### 1. The *Calder* "Effects Test" For Torts

In the tort context, *Calder v. Jones*, 465 U.S. 783, 789 (1984) held specific personal "jurisdiction over [defendants] was proper in California based on the 'effects' of their Florida conduct in California." In this case, a reporter and editor were responsible for an allegedly defamatory story which was circulated in California, where actress Shirley Jones resided. *Calder* held:

> [P]etitioners are not charged with mere untargeted negligence. Rather, their intended, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article … An individual injured in California need not go to Florida to seek from persons who, though remaining in Florida, knowingly cause the injury in California.

*Id.* at 789-90 (citations omitted, emphasis added).

"Distilling *Calder* to its essence … the Court …found purposeful direction there because of the presence of (a) an intentional action … (b) expressly aimed at the forum state … with (c) knowledge that the brunt of the injury would be felt in the forum state". *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1072 (10th Cir. 2008).[13]

### 2. ADC Satisfies The Three-Prong *Calder* Test

First, ADC alleges intentional torts, including claims under RICO, COCCA, fraud, and intentional interference with contract.

---

[13] As *Dudnikov* clarified, "In the tort context, we often ask whether the nonresident defendant 'purposefully directed' its activities at the forum state; in contract cases, meanwhile, we sometimes ask whether the defendant 'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state." *Id.* at 1071 (emphasis added).

<u>Second</u>, ADC suffered its harm in Colorado where it maintained its principal place of business from 1997 to 2002 and expended funds in reliance on the false statements which Lukoil directed there.  *Dudnikov*, 514 F.3d. at 1077 ("plaintiffs' injury was suffered entirely in … Colorado … [where] plaintiff's business [was] based").

<u>Third</u>, Lukoil's tortious conduct – a pattern of over 75 acts of mail and wire fraud in violation of RICO -- was "purposefully directed"  -- or, in *Dudnikov's* vernacular, "expressly aimed" -- at ADC in Colorado.   Federal courts repeatedly sustain jurisdiction when defendants "expressly aim" conduct at plaintiffs which they know will cause harm in the forum under *Calder*.  *Dudnikov*, 514 F.3d. at 1078 (reversing dismissal, finding actions targeting plaintiff "performed for the very purpose of having their consequences felt in the forum state are more than sufficient to support a finding of purposeful direction under *Calder*.") (quotations omitted).[14]  Colorado state courts are no different.[15]  ADC has made a *prima facie* case of specific personal jurisdiction.

---

[14] *Dudnikov* relied on *Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000), which reversed dismissal because the effects test is "satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state  …  'express aiming' encompasses wrongful conduct individually targeting a known forum resident" and *Finley v. River North Records, Inc.,* 148 F.3d 913, 916 (8th Cir. 1998), which held jurisdiction was proper where an out-of-state defendant sent fraudulent material into the forum state with the purpose of inducing plaintiff's reliance, and such reliance was the harmful effect for which plaintiff sought redress). *E.g., Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008) (reversing dismissal because effects test satisfied by "the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum").

[15] *E.g., Foundation for Knowledge v. Interactive Design Consultants, LLC,* 234 P.3d 673, 681-82 (Colo. 2010) (sustaining personal jurisdiction when "alleged misrepresentations occurred in communications intentionally directed at a Colorado corporation")*; Classic Auto Sales, Inc. v. Schocket*, 832 P.2d 233, 237 (Colo.1992) (sustaining personal jurisdiction when fraudulent advertisements and telephone calls directed at Colorado); *D&D Fuller CATV Constr., Inc. v. Pace,* 780 P.2d. 520, 525 (Colo.1989) (sustaining personal jurisdiction when fraudulent communications directed into Colorado).   Here, *Archangel* assumed that Lukoil controlled AGD before ADC moved to Colorado.  ADC corrected the record on remand in 2011, but Judge Hood

### 3.   The Colorado Court Decision Does Not Preclude This Court From Finding Specific Jurisdiction In Colorado Under RICO

This Court decides specific jurisdiction related to RICO under the Fifth Amendment. Judge Hood decided specific jurisdiction under Colorado's "long arm statute" and the Fourteenth Amendment.  These are different tests, as explained above.   This Court is not bound by Judge Hood's interpretation of due process under a different amendment – particularly given that Judge Hood erroneously applied the "purposefully availed" test used for contracts, not the "purposefully directed" test used for torts, as *Dudnikov* requires.

### B.   LUKOIL IS SUBJECT TO JURISDICTION UNDER RULE 4(K)

Fed. R. Civ. P. 4(k)(2) provides: "For a  claim that arises under federal law, serving a summons . . . establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."  Rule 4(k)(2) only requires a foreign "defendant have affiliating contacts with the United States sufficient to justify the exercise of personal jurisdiction over that party." *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico*, 563 F.3d 1285, 1295 (Fed. Cir. 2009).   Thus, if the Court does not accept specific jurisdiction in Colorado, as argued above, given the RICO claim,[16] this court may exercise jurisdiction under Rule 4(k)(2) and the Fifth Amendment based on Lukoil's nationwide contacts. While this test is less rigorous than the "continuous and systematic" test normally applied for general jurisdiction, ADC's complaint and evidence easily satisfy this standard based on Lukoil's direct contacts, as well as those under agency and *alter ego* theories.

inexplicably applied the standard for contract based jurisdiction, not tort based jurisdiction. Prior to *Archangel*, ADC had no opportunity to address this issue because Judge Robbins never considered specific personal jurisdiction in 2002.

[16] The burden is on Lukoil to establish that jurisdiction may be exercised elsewhere, as explained in ADC's Motion to Compel Disclosure (Docket No. 34).

**Agency:** Because "all corporations must necessarily act through agents, a wholly owned subsidiary may be an agent and when its activities as an agent are of such a character as to amount to doing business of the parent" subjecting the parent to *in personam* jurisdiction. *Curtis Publishing Co. v. Cassel*, 302 F.2d 132, 137 (10th Cir. 1962) (upholding jurisdiction). "[W]hen a foreign defendant carries on a continuous and systematic part of its general business in the forum state through its agents, that state's exercise of jurisdiction over an unrelated cause of action is reasonable and just." *Behagen,* 744 F.2d at 733 (reversing dismissal). In short, jurisdiction may be sustained when the activities of the subsidiary or other agent are "sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 423 (9th Cir. 1977) (vacating dismissal for lack of personal jurisdiction over Lichtenstein corporation).

**Alter Ego:** "[T]he alter ego test for attribution of contacts, i.e., personal jurisdiction, is less stringent than that for liability." *Stuart v. Spademan*, 772 F.2d 1185, 1198, n.12. (5th Cir. 1985). Thus, "piercing the corporate veil for the purpose of acquiring jurisdiction over a subsidiary corporation does not require the same strict standards as are necessary to hold a parent corporation liable in damages for acts of its subsidiary." *In re Polyester Staple Antitrust Litig.*, 2008 U.S. Dist. LEXIS 43865, at *38-39, fn. 31 (W.D.N.C. 2008) (sustaining *alter ego* jurisdiction over German company based on downstream U.S. subsidiary).

### 1. Lukoil's U.S. ADR Program

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000) upheld personal jurisdiction under the Fifth Amendment based on activities related to a foreign defendant's ADR program, noting the "continuous presence and substantial activities that satisfy the requirement of doing business do not necessarily need to be conducted by the foreign corporation itself," *id.*

21

at 95, holding:

> While it is true that the Investor Relations Office was not directly involved with the core functions of the defendants' business - the operation of an integrated international oil business, its work was of meaningful importance to the defendants. The defendants are huge publicly-traded companies with a need for access to capital markets… The defendants' Investor Relations program results not from legal or logistical requirements incumbent upon corporations that [register] their shares [in the U.S.], but from the defendants' discretionary determination to invest substantial sums of money in cultivating their relationship with the New York capital markets.

Here, as evidenced by T. Dec.,¶¶17-18, 20, 25-32, Add. C, pp. 2-4, and Exs. 11- 12, 14, 19- 26, Lukoil established an ADR program to gain access to U.S. capital markets through its U.S. attorneys, advisors, bankers, investor presentations, road shows and investor service activities which were so successful that Lukoil ADRs now comprise 66.31% of its charter capital worth roughly $34.6 billion. T. Dec., ¶12, Ex. 11, p. 125.   Lukoil could only achieve this with "continuous and systematic" contacts with the U.S. sufficient to establish a *prima facie* case of jurisdiction, including (1) registration of ADRs with the S.E.C. since 1996, Exs. 12, 22; (2) engaging counsel and other consultants to make innumerable SEC filings since 1996, Exs. 14, 21-22; (3) engaging BONY to hold the ADRs and represent its interests since 1996, Exs. 22, 24; (4) maintaining its own investor relations person, Gennady Krasovsky, as well as consultants Anne McBride Company and PBN, from 2003 on, Exs. 33, 34; (5) sending CEO Alekperov and Officer Fedun to the US almost every year from the mid-1990's onward, Exs. 27-32; and (6) hosting Lukoil "Investors Day" and road shows in the US since apparently the mid 1990's, Exs. 29, 34, 58.

## 2.   Lukoil's U.S. Real Estate

According to June 8, 1998 press release, Lukoil opened a New York office in 1998. T. Dec., ¶16, Ex. 15.  A recent photograph evidences that Lukoil continues to maintain a New York office through the current date, even though it may be technically owned by Lukoil Pan

Americas. T. Dec., ¶41, Ex. 40; Add. C, p. 6.  The continuous operation of an office establishes a *prima facie* case of jurisdiction.  *Ugalde v. Dyncorp, Inc.*, 2000 U.S. Dist. LEXIS 1745, at *7 (S.D.N.Y. Feb. 21, 2000) (*inter alia*, leasing commercial property in New York sufficient to sustain jurisdiction).

### 3.  Lukoil's U.S. Gas Station Network

A *prima facie* case of personal jurisdiction is satisfied, when, as here, a foreign corporation promotes itself as part of an integrated global network to carry on "a continuous and systematic part of its general business in the forum state through its agents."  *Behagen*, 744 F.2d at 733. As *FAIP N. Am., Inc. v. Sistema S.R.L.*, 2005 U.S. Dist. LEXIS 32798, at *10 (N.D. Ill. Dec. 14, 2005) explains, foreign companies can otherwise "reap the benefits and advantages of doing business directly while insulating themselves from lawsuits by using separate subsidiaries and distribution networks to implement their business activities."  "The notion that a company may do [$100 million] of business in the United States without anticipating application of general jurisdiction is implausible at best." *Balintulo v. Daimler AG (In re S. African Apartheid Litig.)*, 643 F.Supp.2d 423, 436 (S.D.N.Y. 2009) (imputing contacts of U.S. subsidiary to German parent).  Lukoil maintains a vast U.S. network of stations as evidenced by Add. C, pp. 6 -11; T. Dec., ¶¶7-19, 21-22, 24, 43; Exs. 1-11, 13, 15-16, 18, 37.

First, Lukoil widely promotes its U.S. gas station network as its own,  which is as large as the one it operates in its home country.  These are not ADC's statements – these are Lukoil's own statements from its annual reports, press releases, and other documents made over many years. T. Dec., Add. C, p. 11.

Second, Lukoil's materials and public statements regarding its ownership, strategy, and "market share" of the U.S. gas stations, Exs. 5, 13, 15, 16, 18, 37, represent the type of

"continuous and systematic" contacts, which numerous courts have found sufficient to support finding of jurisdiction.[17]

Third, Lukoil's use of its U.S. gas stations as vehicles to provide synergy for exporting and distributing petroleum products to the U.S. from Lukoil's production facilities, Exs. 5, 13, 18, also represents requisite business presence in the U.S. to sustain jurisdiction. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558 (Fed. Cir. 1994) (conduct of manufacturer who shipped its products through intermediaries for ultimate sale to consumers in the U.S. sufficient to establish jurisdiction).

In sum, all of the activity, described above, even if conducted by Lukoil U.S. agents, represents a "continuous and systematic" business presence in the U.S. *See SGI Air Holdings II LLC v. Novartis Int'l AG*, 239 F. Supp. 2d 1161, 1169 (D. Colo. 2003) (finding personal jurisdiction where subsidiary's business mirrored a "core business" and was "essential" to parent's business, parent had "assumed the risks" of subsidiary's business ventures and, thus, subsidiary was agent of parent for jurisdictional purposes).

### 4.  Lukoil's U.S. Trademarks And Marketing

As evidenced by Add. C, pp. 11-12; also Exs. 6, 42, 54, Lukoil's property interest in its U.S. trademarks and open and notorious use of its marks in its U.S. marketing campaigns are long standing contacts which establish a *prima facie* case of personal jurisdiction.  *See In re Polyester Staple Antitrust Litig.*, 2008 U.S. Dist. LEXIS 43865, at *58 (foreign parent's

---

[17] *See*, *e.g. Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 U.S. Dist. LEXIS 16857, at *22-25 (D.N.J. June 7, 2005) (finding jurisdiction over KPMG UK because it "holds itself out to the world as part of an integrated global entity that provides services to its clients worldwide, and often holds itself out as indistinguishable from its U.S. counterparts."); *Sleigh Corp. v. Bureau Van Dijk*, 1996 U.S. Dist. LEXIS 5746, at *3 (S.D.N.Y. May 1, 1996) ("Reaping the benefit of this representation [of having a global network], BvD Belgium cannot now disavow its connection to the same global network for personal jurisdiction purposes.").

marketing and adoption of U.S. subsidiary's trademark a factor establishing national contacts); *In re Latex Gloves Prods. Liab. Litig.*, 2001 U.S. Dist. LEXIS 12757, at *20  (E.D.Pa. 2001) ("the use by the [ ] entities of the same corporate logo tends to support a finding of both alter-ego and functional and organic identity").[18]

### 5.   Lukoil's U.S. Credit Card Program

As evidenced by Add. C, p.13 and Exs. 41, 56-57, Lukoil's credit cards not only provide financial compensation to Lukoil through its contracts with the banks, they provide incentives for American consumers to purchase Lukoil gasoline.   Issuance of credit cards to many thousands of consumers and businesses evidences "continuous and systematic" contacts sufficient to establish a *prima facie* case of personal jurisdiction.

### 6.   Lukoil's U.S. Ex-Im Bank Business

Lukoil does not deny that it negotiated and received loan guaranties from the U.S. Export-Import Bank in the U.S. Ex. 38.  Instead, it makes up an argument that these extensive contacts are unrelated to jurisdiction, distorting caselaw.[19]  If Lukoil has done business with the Ex-Im Bank since 2002, it has "purposefully availed" itself of the privileges of doing business in

---

[18] *See also In Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1416 (Fed. Cir. 2009) (holding personal jurisdiction under Rule 4(k)(2) over foreign law firm that "purposefully directed its activities at the United States" by submitting patent application to the USPTO, noting: "one who has sought and obtained a property interest from a U.S. agency [USPTO]  has purposefully availed itself of the laws of the United  States.");  *National Patent Dev. Corp. v. T.J. Smith & Nephew Ltd.,* 877 F.2d 1003, 1010 (D.C. Cir. 1989) (*en banc*) (R.B. Ginsburg, J.) (upholding jurisdiction under federal long-arm statute, noting: "By registering a patent in the United States Patent Office, a party residing abroad purposefully avails itself of the benefits and protections patent registration in this country affords").

[19] Lukoil cites *Siam Kraft Paper Co. v. Parsons & Whittemore, Inc.*, 400 F. Supp. 810, 811-812 (D.D.C. 1975) for the "government contracts" exception to jurisdiction.  However, this doctrine is designed to protect the District of Columbia from a floodgate of suits over entities which do business with the federal government otherwise unrelated to the D.C. forum.   This doctrine has nothing to do with whether Lukoil's extensive business with the U.S. government is relevant to "minimum contacts" under the Fifth Amendment and Rule 4(k)(2).

the U.S. sufficient to establish a *prima facie* case of personal jurisdiction.  It is ludicrous to

suggest that Lukoil can do extensive business with our government on the one hand, *see* Exs. 17,

38-39, but not be subject to jurisdiction for violation of our laws, like RICO.

### 7.   Lukoil's U.S.-Based Global Trading Business

As evidenced by Add. C, p. 14 and Exs. 20, 37, 40, Pan Americas is Lukoil's agent,

through which "a foreign defendant carries on a continuous and systematic part of its general

business" to justify exercise of jurisdiction. *Behagen*, 744 F.2d at 733.  *See also SGI Air*

*Holdings II LLC v. Novartis Int'l AG*, 239 F.Supp.2d at 1169.

**In sum,** whether through Lukoil's direct contacts, such as the ADR program, New York

office, U.S trademarks, and Ex-Im Bank business, or the conduct of its general business through

wholly owned subsidiaries and agents, such as its vast U.S. gas station network, advertising,

credit cards, and global oil trading, ADC has evidenced sufficient "continuous and systematic"

contacts to establish a *prima facie* case of jurisdiction under Rule 4(k)(2). And, further, given

that Lukoil's own statements submitted by ADC as evidence conflict with its affiants "denials",

the affidavits should be disregarded. *Behagen,* 744 F.2d. at 733.

### C.   LUKOIL IS SUBJECT TO GENERAL JURISDICTION BASED ON ITS *DE FACTO* COLORADO OFFICE FROM DECEMBER 1, 2001 ONWARD

Under agency and *alter ego* theories, Lukoil used DSE to avail itself of the privilege of

doing business in Colorado for <u>years</u> by recruiting and employing over 75 Lukoil Colorado

Employees to service <u>five</u> Lukoil subsidiaries in its core oil drilling business – while paying

<u>every</u> cent of the expenses incurred by DSE through the "Slush Fund Companies" which were

reimbursed by the five Lukoil subsidiaries.  ADC submits substantial evidence to support its

Complaint.  *See* Add. D; Exs. A- K, P-S.

<u>First</u>, DSE was Lukoil's "pass-through", in-house "Recruiters Я Us" used to staff its core

oil-producing subsidiaries with Coloradans.   DSE staffed five Lukoil subsidiaries with 75

Colorado engineers.   If DSE had not done this for Lukoil, Lukoil would have had to have done

so itself.   "[W]hen a foreign defendant carries on a continuous and systematic part of its general

business in the forum state through its agents, that state's exercise of jurisdiction over an

unrelated cause of action is reasonable and just."   *Behagen*, 744 F.2d at 733.

Second, while illegality may not mandate agent/*alter ego* jurisdiction, it provides a

compelling justification when combined with control and the complete absence of formalities, as

here, including, *inter alia*, (a) DSE operating as a mere "pass through", engaged in the Colorado

Tax Fraud, Cash Smuggling and False Expenses schemes; (b) Gilwood, Ltd. doing business with

DSE in 2003 and 2004 years after its dissolution; and (c) Oldberry, Ltd. and Lukoil Israel, Ltd.

being nothing more than shells. *FDIC v. First  Interstate Bank, N.A.*, 937 F.Supp. 1461, 1467(D.

Colo. 1996) (sustaining jurisdiction because when "the corporate entity [is used] to perpetuate a

fraud or wrong on another, equity will permit plaintiff to pierce the corporate veil").

 Third, the only "evidence" which Lukoil submitted to contest ADC's allegations

concerning DSE are the 2010 and 2012 affidavits of Lukoil attorney Zubkov which summarily

deny DSE was Lukoil's agent. *See* Ex. 46.   However, Zubkov submits nothing evidencing his

denials are based on personal knowledge, making his affidavits inadmissible hearsay. *Foster v.

AlliedSignal Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) ("affidavit submitted by [plaintiff's]

attorney set forth facts about which he had no personal knowledge … [and, thus] such facts were

inadmissible as evidence").   He does not identify a single document or a person on which he

relies.   This Court considers hearsay under federal law; however Judge Hood interpreted

Colorado law is irrelevant, particularly given that he *sua sponte* considered Zubkov to be an

expert entitled to rely on hearsay, a gross violation of ADC's due process rights..

Fourth, even applying factors used to pierce the corporate veil,[20] -- a more stringent test

than agency or *alter ego* jurisdiction, they establish DSE was Lukoil's agent and/or *alter ego*:

- Nominal Existence: DSE existed solely to do the bidding of Lukoil and the Slush Fund Companies, including the Colorado Tax Fraud, Cash Smuggling and False Expenses Schemes. Compl.¶75, 76, 79; Ex. A, pp.46-53, 70-77. The Slush Fund Companies existed for the same purpose. Compl. ¶¶ 79-80; Exs. H, I.

- Common Control: Sillerud served as Lukoil Israel and Lukoil AIK director , Compl.¶81; Ex. A, pp.30-33, 82-85. Lukoil CFO Kukura and Lukoil AIK director Goldwasser controlled the Slush Fund Companies which controlled DSE.  Compl. ¶¶81-82; Exs. E, K.

- No Independent Financing:  DSE was financed by the Slush Fund Companies which reimbursed <u>all</u> expenditures. Compl.¶75; T.Dec., Ex. A, pp.22-25, 42-45.   In turn, the Slush Fund Companies were financed by Lukoil operating companies. Compl.¶¶79,80; Ex. H.

- No Adequate Corporate Records: DSE had no records for use of the smuggled cash or to substantiate the False Expenses. Ex. A, pp. 82-85.

- Sole Purpose to Serve Lukoil Related Entities: The sole purpose of DSE and the Slush Fund Companies was to serve Lukoil companies.  Compl.¶74-80; Ex. A, pp.18-21, 30-33, 81-93, 106-109; Exs. H, I.

- No Capital: DSE had no capital, given all expenses were funded by the Slush Fund Companies.  Compl.¶75; Ex. A, pp.22-25, 42-45. Lukoil Israel's capital was $2,100; Oldberry's was $1,000; Gilwood was dissolved.  Ex. Q, p.7; Ex. R, p.7; Ex. S, p.7; Exs. F, G.

- No Independent Business:  DSE and the Slush Fund Companies had no business except servicing Lukoil.  Compl.¶75; Ex. A, pp.22-25.

- Domination:  DSE did not act independently, but took direction from Goldwasser and the Slush Fund Companies. Compl.¶ ¶81, 82; Ex. A, pp.46-53, 70-77. Lukoil Israel was controlled by Kukura and managed by Goldwasser. Compl. ¶¶23-24, 86; Ex. E.

- Mere Shell:  DSE was a "pass through" company. The Slush Fund Companies were mere shells without employees, offices, or operations, all using the same Israel address. Compl.¶75; Ex. A, pp. 58-65.

- Ignored Formalities:  DSE had no written contracts with the Slush Fund Companies, and kept no records of use of the smuggled cash or substantiating the False Expenses.

---

[20] *See Great Neck Plaza, L.P. v. Le Peep Restaurants, LLC*, 37 P.3d 485, 490 (Colo.App. 2001) (factors for piercing the corporate veil); *In Re: Phillips*, 139 P.3d 639, 644 (Colo. 2006) (factors for reverse veil piercing).

Gilwood was operated though dissolved; Sillerud purported not to know he was a Lukoil Israel director. Compl. ¶78; Ex. G; Ex. A, pp.74-93.

- Illegality/Misuse:  DSE engaged in the Colorado Tax Fraud, Cash Smuggling and False Expenses Schemes.  Compl. ¶¶75-80.  The Slush Fund Companies funded these schemes.

 In sum, ADC has set forth a *prima facie* case that DSE served as the agent/*alter ego* of Lukoil in doing business in Colorado to recruit and pay over 75 Coloradans to service five Lukoil subsidiaries from December, 2001, regardless of Zubkov's affidavits.

**D.    LUKOIL DOES NOT MAKE A "COMPELLING CASE" JURISDICTION WOULD BE  UNCONSTITUTIONALLY UNREASONABLE[21]**

Once a plaintiff has established that a defendant has the requisite minimum contacts under specific or general jurisdiction, the defendant may challenge that jurisdiction does not comport with "fair play and substantial justice."  *Burger King,* 471 U.S. at 476.  "A court may consider several factors in determining whether the exercise of jurisdiction is proper, including the burden on the defendant, the forum state's interest in resolving the controversy, and the plaintiff's interest in attaining effective and convenient relief."  *Id.* at 1195.   Lukoil must present a "compelling case" that the exercise of jurisdiction is unconstitutionally unreasonable. *Burger King* at 477; *see also Republic of Panama*, 119 F.3d at 946 (in federal question case, "Only when a defendant challenging jurisdiction has presented a compelling case that would render jurisdiction unreasonable, should courts weigh the federal interests favoring the exercise of jurisdiction") (citations and quotations omitted).

First, the burden on Lukoil defending in Colorado is minimal, given its extensive network of operations in the U.S., described above.  Its Fed.R.Civ.P. 26 disclosures made when Lukoil

---

[21] In holding that the exercise of jurisdiction would be unreasonable under the Fourteenth Amendment, Judge Hood erroneously placed the burden on ADC, not Lukoil, completely flawing the analysis.  T. Dec., Ex. 66, pp. 6-8, 13-15. Further, he gave no consideration to the interests of the U.S. in enforcing RICO. His holding is of no significance.

removed to federal court in 2002 reveal only five witnesses, all under its control. T. Dec., Ex. 43.

Bringing these witnesses to Colorado for trial would involve minimal expense to Russia's largest

oil company, with extensive contacts with Colorado and the U.S.

Second, the U.S. "generally has a 'manifest interest' in providing its residents with a

convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King*, 471 U.S.

at 462, 473. ADC was a U.S.resident when it suffered its harm in Colorado and filed this

litigation and, through Trustee Cordes, a Colorado resident now. In addition, the "United States

obviously has an interest in enforcing its statutes," such as RICO and COCCA. *Pandaw Am.,*

*Inc. v. Pandaw Cruises India Pvt. Ltd.*, 2012 U.S. Dist. LEXIS 13692, *19 (D. Colo. Feb. 6,

2012) (sustaining personal jurisdiction over federal claims).[22]

Third, ADC has a compelling interest in obtaining redress in a convenient and

inexpensive home forum. Although bankrupt, pursuant to the Plan of Liquidation, T. Dec., ¶87,

Ex. 63, it found counsel willing to prosecute the case on a contingency basis and a lender willing

to fund expenses. Dismissing the case to Russia would be its death knell; no law firm or funder

would undertake a case against Russia's largest oil company in the easily influenced Russia

courts. *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1097 (10th Cir. 1998)

(plaintiff's interest in relief "may weigh heavily in cases where a Plaintiff's chances of recovery

will be greatly diminished by forcing him to litigate in another forum because … the burden may

be so overwhelming as to practically foreclose pursuit of the lawsuit"); *Cory,* 468 F.3d at 1232

("Insulating a criminal enterprise from liability, when, for instance, the victim is unable to

finance long-distance litigation, is not consistent with RICO's purpose").

---

[22] *E.g., Synthes,* 563 F.3d.at  1299 (reversing dismissal for lack of personal jurisdiction over
federal claims, holding "The United States has a 'substantial interest' in enforcing the federal …
laws … [and] also has an interest in discouraging injuries that occur within its boundaries").

**E.    ADC IS ENTITLED TO DISCOVERY TO THE EXTENT IT HAS NOT ESTABLISHED A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION UNDER RULE 4(k)(2) OR RELATED TO DSE**

When jurisdiction is at issue, *Sizova v. Nat'l Inst. of Stds. & Tech.*, 282 F.3d 1320, 1326

(10th Cir. 2002) held:

> When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion… A refusal to grant discovery constitutes an abuse of discretion if the denial results in prejudice to a litigant... Prejudice is present where pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary.

*Health Grades, Inc. v. Decatur Mem. Hosp.*, 190 Fed. Appx. 586, 589 (10th Cir. 2006)

adopted this standard in finding an abuse of discretion for refusing personal jurisdiction

discovery.[23]    If ADC has not made a *prima facie* case of jurisdiction, ADC has made a

"threshold showing" or a "sufficient start" under *Sizova* to justify discovery regarding Lukoil's

nationwide ties under Rule 4(k)(2) and DSE, as set forth in its pending discovery motions

(Docket Nos. 41 and 43), to close any gaps which the Court may perceive.[24]

**F.    THIS COURT SHOULD DEFER FINAL DECISION ON PERSONAL JURISDICTION TO TRIAL**

Personal jurisdictional issues – Lukoil sending over 75 fraudulent mailing and wires into

---

[23] *See, e.g.*, *7240 Shawnee Mission Holding v. Nazir Memon*, 2008 U.S. Dist. LEXIS 93590, at *15-16 (D. Kan. Aug. 26, 2008) (*citing Sizova* in allowing personal jurisdiction discovery); *Felix v. Am. Honda Motor Co.*, 2008 U.S. Dist. LEXIS 5266, at *9 (D. Kan. Jan. 23, 2008) (allowing personal jurisdiction discovery under *Sizova*, because "a more satisfactory showing of the facts is necessary for the court to determine whether defendants were involved in a conspiracy to commit a business tort").

[24] *E.g.,Toys "R" US, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (reversing dismissal, holding "courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous'"); *Uebler v. Boss Media, AB*, 363 F.Supp.2d 499, 506 (E.D. N.Y. 2005) (although plaintiff had not made a *prima facie* showing, a "sufficient start" toward establishing personal jurisdiction warranted discovery). This is especially true where "the facts … are within the particular knowledge of the defendants." *Franklin Willow Ridge Assoc. v. DCB/Moore, Ltd.*, 1991 U.S. Dist. LEXIS 8254, at *12 (E.D. Pa. 1991).

Colorado on which ADC relied and suffered loss, Compl., ¶91, while conducting a massive

money laundering scheme through DSE, Compl., ¶96 --  are inextricably tied to the RICO merits.

In such case, jurisdiction should ultimately be decided at trial, not the motion stage, to avoid "a

summary decision on the merits without the ordinary incidents of a trial including the right to

jury." *Schramm v. Oakes*, 352 F.2d 143, 149 (10th Cir. 1965).   Thus, if ADC establishes a

*prima facie* case of personal jurisdiction based on its RICO claims, now or after discovery,

jurisdiction should be decided at trial.

## IV.   THE COMPLAINT SHOULD NOT BE DISMISSED FOR *FORUM NON*

Dismissal for *forum non conveniens* is an "extraordinary" remedy that should only rarely

be granted.   *Quackenbush v. Allstate Ins. Co.*, 517 U.S.706, 721-22 (1996).   "The burden is on

the moving party to establish the need for a *forum non conveniens* transfer." *Rivendell Forest*

*Prods. v. Canadian Pac. Ltd.*, 2 F.3d 990, 993 (10th Cir. Colo. 1993).   As a threshold matter, "if

domestic law applies … then *forum non conveniens* doctrine is inapplicable."   *Id.* at 994.

Thereafter, a U.S. plaintiff's choice of any U.S. forum is entitled to a heightened degree of

deference, *Duha v. Agrium, Inc.*, 448 F.3d 867, 873-74 (6th Cir. 2006), and "should rarely be

disturbed." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981). [25]   Beyond the issue of

deference, the *forum non* analysis then is a two-pronged inquiry.   The defendant must establish

(1) that an "available and adequate alternate forum" can hear the case, *Duha*, 448 F.3d at 873,

and (2) retaining the case in the plaintiff's chosen forum would "establish… oppressiveness and

---

[25] Lukoil's argument grossly distorts the test.  For example, *Piper* does not remotely stand for the proposition the "finding trial in plaintiff's chosen forum would be burdensome … is sufficient to support dismissal."   Nor does the application of foreign law require dismissal.   *Rivendell*, 2 F.3d at 994 ("if foreign law applies, a district court would abuse its discretion [in dismissing] if the record does not contain substantial reasons, other than the choice-of-law issue, why the foreign forum is more convenient").

vexation to a defendant… out of all proportion to plaintiff's convenience, or when the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems." *Piper,* 454 U.S. at 241 (quotations omitted).   Lukoil does not come close to defeating ADC's choice of a U.S. home forum.

## A.   *FORUM NON* MUST BE DENIED BECAUSE U.S. LAW APPLIES

"[U]nder our precedents, *forum non conveniens* is not applicable if American law controls." *Rivendell,* 2 F.3d at 994.   Here, ADC asserts claims under RICO, COCCA, and other Colorado law.   Lukoil has not even moved to dismiss the non-statutory claims or argued they are not governed by Colorado law.   This is dispositive.   *Rivendell; Std. Bank PLC v. Vero Ins. Ltd.,* 2009 U.S. Dist. LEXIS 28821, at *6-7 (D. Colo. Feb. 24, 2009) (if foreign law does not apply, "then *forum non conveniens* is inapplicable and the case may not be dismissed on those grounds") (*citing Gschwind v. Cessna Aircraft Co.,* 161 F.3d 602, 605-606 (10th Cir. 1998)).

## B.   ADC'S CHOICE OF FORUM IS ENTITLED TO SUBSTANTIAL DEFERENCE

There is "a strong presumption in favor of the plaintiff's choice of forum." *Piper,* 454 U.S. at 255.   "The benefit for a U.S. resident plaintiff of suing in a U.S. forum is not limited to suits in the very district where the plaintiff resides, especially considering that the defendant may not be amenable to suit in the plaintiff's district of residence … the 'home forum' of an American citizen for forum non conveniens purposes is any 'United States court'". *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 103 (2d Cir. 2000) (citations omitted).   Lukoil's argument that ADC's choice of forum should be given no deference because it is not a U.S. citizen is nonsense.

First, ADC is a U.S. citizen because the citizenship of a trust is that of its trustee, Cordes. *Navarro Savings,* 446 U.S. at 465-66.   More importantly, ADC brought this suit in 2001 when it was a U.S. resident because it maintained its principal place of business here from 1997 onward,

and ADC's harm was caused by Lukoil's conduct which took place from 1998 onward when

ADC was based here.   ADC only moved from Colorado because it ran out of funding after the

Colorado court improperly dismissed the case in 2002.  Compl., ¶¶ 9-14, 45, 66-68, 103.

*Archangel,* 2006 Colo.App.Lexis 1055, recognized this when denying Lukoil *forum non.*

     <u>Second,</u> even if ADC were a foreign, under the sliding scale test set forth in *Iragorri v.*

*United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001), it would still be entitled to substantial

deference because (1) its main witnesses are Colorado residents (former CEO Haddon, CFO

Davis) or otherwise reside in the West and speak English, not Russian, T. Dec., ¶¶ 90-93; (2) its

documents are located in the U.S. and are mainly in English, not Russian, T. Dec., ¶¶ 94-95; and

(3) it has no attorney or funder willing to sue Russia's largest oil company in the easily

influenced Russian courts.  *Norex Petroleum, Ltd. v. Access Indus.*, 416 F.3d 146, 155 (2d Cir.

N.Y. 2005) (granting substantial deference to foreign plaintiff's choice of forum under *Iragorri).*

     <u>Third,</u> when ADC entered into the Agreement in 1993 and 1994, AGD was controlled by

the Russian government.   ADC has no reason to anticipate the rise of the oligarch system, led by

Usmanov and Alexperov, and corruption problems of Russian courts beginning in the 1990's, or

that Lukoil would take over AGD in 1998.  Further, the Agreement provided for arbitration in

Stockholm, not litigation in Russia.   ADC never undertook to litigate in influenced Russian

courts when it did its deal with AGD, as explained in the Krel Dec., ¶¶ 8, 10-13, T. Dec., Ex. 61.

     Under *Piper, Wiwa, Iragorri,* and *Norex,* ADC's choice of its home U.S. forum for

undisputably proper reasons is entitled to substantial deference.

### C.    LUKOIL HAS NOT ESTABLISHED THAT THE PRIVATE INTEREST FACTORS ESTABLISH "OPPRESSIVENESS AND VEXATION"

*Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947) articulated the private interest factors

that guide the *forum non* analysis which include:  "[1] the relative ease of access to sources of

proof; [2] availability of compulsory process for attendance of unwilling, and [3] the cost of

obtaining attendance of willing, witnesses; [4] possibility of view of premises, if view would be

appropriate to the action, and [5] all other practical problems that make trial of a case easy,

expeditious and inexpensive." *Id.* Lukoil, which merely filed the conclusory 2012 Zubkov

affidavit, fails to meet his burden that the private interest factors "establish . . . oppressiveness

and vexation to a defendant . . . out of all proportion to plaintiff's convenience" here. *Koster v.*

*(American) Lumbermens Mut. Casualty Co.,* 330 U.S. 518, 524 (1947).

First, "[a]ccess to non-witness sources of proof, including documents in particular, is

properly considered as part of the ease-of-access factor." *Duha*, 448 F.3d at 874. Lukoil's

argument that access to sources of proof somehow favors Russia is specious.   All documents

related to the core of this dispute are under the control of the parties (i.e. correspondence,

financial documents) and, further, most documents are in English. T. Dec., ¶¶ 94-95. If this case

were litigated in Russia, ADC would be required to translate its documents into Russian, a

burden no less than that Lukoil alleges.  Thus, this factor imposes no "oppressiveness or

vexation" and strongly favors ADC.

Second, none of ADC's witnesses listed in its 2012 disclosures, *see* Ex. 65, are under its

control.   T. Dec., ¶¶ 90-93.  None of its key witnesses have agreed to testify in Russia, other

than Michael Krel. T. Dec., ¶93. With exception of Krel, who speaks both languages, all ADC

witnesses speak English, not Russian.  T. Dec., ¶90. The key third party witnesses to the Cash

Smuggling Scheme – Sillerud and the engineers who smuggled the cash -- reside in Colorado.

In contrast, all five Lukoil witnesses are under its control.   Thus, this factor imposes no

"oppressiveness or vexation" and strongly favors ADC.

Third, the cost of willing witnesses imposes no "oppressiveness or vexation" on Lukoil

which controls its five witnesses.  Their testimony can be preserved by deposition and/or they can be flown to the U.S. for trial at minimal cost.  There is no cost for Haddon and Davis testifying here.  Thus, this factor imposes no "oppressiveness or vexation" and strongly favors ADC.

Fourth, Lukoil refers to no other private interest factors  which would  impose "oppressiveness or vexation".   Its argument that Russian law applies because the case involves licenses granted by the Russian government is ridiculous.   ADC's claims are asserted under American law, not Russian.   ADC is not seeking to enforce any licenses; ADC seeks damages arising from fraud as well as interference with AGD's performance under the Agreement.[26]

### D.    LUKOIL HAS NOT MET ITS BURDEN THAT THE PUBLIC INTEREST FACTORS HEAVILY FAVOR DISMISSAL TO RUSSIA

Public interest factors include court congestion, the "local interest in having localized controversies decided at home," the interest in having a foreign court apply its own law and concomitant avoidance of problems regarding the application of foreign law, and "the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper*, 454 U.S. at 241.  Lukoil fails to meet his burden that trial in this forum is "inappropriate because of considerations affecting the court's own administrative and legal problems."  *Id.* (citations omitted).

First, Lukoil does not allege this District is congested.   *See T & W Forge, Inc. v. V & L Tool, Inc.*, 2005 U.S. Dist. LEXIS 24619, at *32 (N.D. Ohio Oct. 21, 2005) ("Docket congestion will be given no weight because this Court's docket is not congested.").   Nor has this case involved a "decade" of litigation.  The 2001 case was dismissed in 2002 and the appeal process

---

[26] As Lukoil notes, in the original Stockholm arbitration filed in 1998, ADC agreed that Russian law generally governed its claims against AGD.   However, in the renewed 2007 arbitration, ADC argued that this was not so, and, rather, Swedish law governed.   T. Dec., ¶ 88, Ex. 64. In any case, whether Russian law may govern claims against AGD does not determine which law governs claims against Lukoil, particularly given the RICO and COCCA claims.

lasted until 2007.  Thereafter, the case was stayed pending settlement efforts until it was renewed

in 2009 when a single deposition was taken.  After removal to the Bankruptcy Court, the court

stayed discovery at Lukoil's request and the matter remanded in late 2010.   Judge Hood refused

to permit any discovery and dismissed in October, 2011.  If this case will take an "incredible

amount" of this Court's time, it will be due to Lukoil, not ADC.

    Second, "[t]here is a strong federal interest in making sure that plaintiffs who are U.S.

citizens generally get to choose an American forum for bringing suit, rather than having their

case relegated to a foreign jurisdiction." *Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1312

(11th Cir. 2002); *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097,

1104 (11th Cir. 2004) ("the United States has a strong interest in providing a forum for its

citizens' grievances against an allegedly predatory foreign business").   Thus, this factor strongly

favors ADC which maintained its principal place of business in Colorado when the wrongdoing

occurred and is a trust created under U.S. law now, with numerous American beneficiaries.

    Third, RICO, COCCA and Colorado common law govern ADC's claims.  Under

*Rivendell,* this is dispositive.   Whether the diamond license is governed by Russian law is

irrelevant to ADC's claims against Lukoil, as explained above.  Thus, this factor decides the

issue, or, alternatively, strongly favors ADC.

    Fourth, an American jury has a strong interest in protecting ADC, which maintained its

principal place of business in the U.S. when the harm occurred and is a U.S. entity now, with

American beneficiaries.  "[A]n American citizen's home forum is deemed to be any United

States court… The harm suffered by [the plaintiff] is of local interest to the United States and an

American jury has an interest in evaluating that harm." *Ingram Micro, Inc. v. Airoute Cargo

Express, Inc.*, 2001 U.S. Dist. LEXIS 2912, at *15-16 (S.D.N.Y. Mar. 21, 2001).   Contrary to

Lukoil's argument, Russia has no special interest in this dispute simply because Lukoil, one of

the world's largest multi-national oil firms with extensive American operations, is headquartered

there.  ADC is not seeking injunctive relief related to the diamond licenses, only damages.

### E.      RUSSIA IS NOT AN ADEQUATE FORUM FOR THIS DISPUTE

Lukoil has submitted the declaration of Paul Stephan for the proposition that Russia is an

adequate alternate forum because ADC's allegations may state claims under Russian law and

Russian courts are not as corrupt as most people think.   However, as evidenced by the

declaration of James Passin, ADC's litigation funder, no funder would ever support this case

filed against Lukoil in Russia because of concern over influence and corruption in Russian

courts. Passin Dec., ¶¶1, 7-12, T. Dec., Ex. 62.  Nor would any law firm take it on a contingency.

Thus, from a practical perspective, Russia is an inadequate forum because dismissal would be the

death knell of these claims.  *OMI Holdings*, 149 F.3d at 1097; *Cory,* 468 F.3d. at 1232.

### V.      THE NON-FEDERAL CLAIMS SHOULD NOT BE OTHERWISE BE DISMISSED BECAUSE THEY ARE NOT PENDENT

Lukoil's argument that the ADC's "pendent state law claims" should be dismissed

pursuant to 28 U.S.C. §1367(c) misses a significant point – these are not pendent claims.

Because ADC is a Colorado citizen based on the citizenship of its trustee Cordes, and Lukoil is a

citizen of a foreign state, this Court exercises diversity jurisdiction over the non-federal claims

pursuant to 18 U.S.C. §1332.  This Court has no "discretionary power" to dismiss them.  Further,

assuming, *arguendo,* the claims are pendent, they should not be dismissed "because judicial

economy and fairness result from retaining jurisdiction over mixed state and federal claims

where 'The state and federal claims ... derive from a common nucleus of operative fact,'" as here

where the same acts support the RICO, COCCA, and fraud claims.  *Arc of the Pikes Peak Region*

*v. Nat'l Mentor Holdings, Inc.*, 2011 U.S. Dist. LEXIS 35877, at *12 (D. Colo. Mar. 18, 2011).

**CONCLUSION**

For the foregoing reasons, Lukoil's motion to dismiss should be denied.   Alternatively, to the extent ADC has not established a *prima facie* case of personal jurisdiction, ADC should be provided discovery so that it can supplement the record prior to a final decision.  Further, given that issues of personal jurisdiction are "inextricably intertwined" with the merits of ADC's RICO and COCCA claims, a final decision on personal jurisdiction should be deferred to trial.


Dated: <u>May 2, 2012</u>

<u>/s/ Bruce S. Marks</u>
Bruce S. Marks,  Esq.                            Chad McShane, Harold R. Bruno, III
MARKS & SOKOLOV, LLC                    ROBINSON WATERS & O'DORISIO, P.C.
835 Market Street, 28th Floor                 1099 18th Street, Suite 2600
Philadelphia, PA 19103                         Denver, CO 80202
(215) 569-8901                                    (303) 297-2600

*Attorneys for Plaintiff Archangel Diamond Corporation Liquidating Trust*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 2nd day of May, 2012, a true and correct copy of the foregoing Plaintiff Archangel Diamond Corporation Liquidating Trust's Opposition to Defendant OAO Lukoil's Motion to Dismiss  along with supporting exhibits was served via electronic filing notification via the Court's CM/ECF system as follows:

Frederick J. Baumann, Esq.
Douglas B. Tumminello, Esq.
Rothgerber Johnson & Lyons LLP
1200 17th Street, Suite 3000
Denver, CO  80202
fbaumann@rothgerber.com
dtumminello@rothberger.com

Michael K. Swan, Esq.
Akin, Gump, Strauss, Hauer & Feld, LLP
111 Louisiana Street, 44th Floor
Houston, TX  77002-5200
mswan@akingump.com

**MARKS & SOKOLOV, LLC**

Dated: <u>May 2, 2012</u>          By:     <u>*/s/ Maria Temkin*</u>
                                    Maria Temkin

40