**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Case No. 12-cv-00041-RM-MJW

ARCHANGEL DIAMOND CORPORATION LIQUIDATING TRUST,

      Plaintiff,

v.

OAO LUKOIL,

      Defendant.

---

**ORDER**

---

THIS MATTER comes before the Court on Defendant OAO Lukoil's ("Lukoil") Motion to Dismiss ("Motion") Plaintiff Archangel Diamond Corporation Liquidating Trust's ("Trust"), as successor-in-interest to Archangel Diamond Corporation ("Archangel"), Complaint pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(6), and under abstention theories.  (ECF No. 29.)  The Trust's action against Lukoil, a Russian corporation, arises from allegations that it joined and furthered an "illegal scheme" ("Illegal Scheme") by Arkhangelskgeoldobycha ("AGD"), a Russian corporation, to deprive Archangel, a Canadian corporation, of the benefits of a "rich" diamond discovery in Russia.  The primary issues before the Court are whether this action should be dismissed for lack of personal jurisdiction and/or *forum non conveniens*.

The participants (AGD and Lukoil) in the alleged Illegal Scheme are Russian entities and the party injured (Archangel) was a Canadian corporation.  Lukoil's conduct complained of, however, had connections not only to Russia but also to Colorado as that was where Archangel

had its principal place of business and felt the effects of *Lukoil's* alleged conduct – the lulling of Archangel into investing more funds to potentially develop the diamond discovery and the bankruptcy of Archangel in Colorado.  But, the Colorado state courts have already determined that they may not exercise specific or general personal jurisdiction over Lukoil, albeit under Colorado's long arm statute and the Fourteenth Amendment, on the claims now before this Court.  And, after a careful consideration of the record and the applicable laws, the Court reaches the same conclusion as that of the Colorado state courts – that Lukoil is not subject to personal jurisdiction in Colorado – and, further, that this action should be dismissed based on *forum non conveniens*.

## I.  BACKGROUND: CLAIMS AGAINST LUKOIL

In Order to understand the claims against Lukoil, events which allegedly occurred prior to Lukoil's involvement merit discussion.

## A.    THE RUSSIAN DIAMOND LICENSE

### 1.  The Russian Connections

In 1993, Russia announced a competitive tender for the development of diamonds in the Archangelsk Region in Northern Russia.  (ECF No. 1, Complaint, ¶¶27, 28.)  Archangel's predecessor[1] negotiated a joint venture agreement with State Enterprise Arkhangelgeology ("AGE"), a Russian state corporation, to submit a tender to develop the "Verkhotina Area" in the Archangelsk Region.  (Complaint, ¶¶ 16, 29.)  Thereafter, in November 1993, Archangel entered into an agreement (the "1993 Agreement") with AGE to form a joint venture in which AGE

---

[1] Canadian company Gold Parl Resources Limited, later renamed Canmet Resources Limited.  (Complaint, ¶29; ECF No. 47-66, ¶6.)  As the change in names or ownership are irrelevant, and for ease of reference, "Archangel" will be used.

would bid for the license and Archangel would provide up to $5.3 Million funding for the diamond exploration/development license.  (Complaint, ¶30.)  In December 2013, AGE won the tender and received the Diamond License issued by the Russian government.  (Complaint, ¶30.)

In January 1994, Archangel and AGE agreed that additional funds would be needed and the Diamond License would be transferred to the joint venture, as subsequently memorialized in February 25, 1994 (the "1994 Memorandum") (1993 Agreement and 1994 Memorandum, collectively, "Agreement").  (Complaint, ¶31.)  The parties incorporated Almazny Bereg ("AB") as the joint venture company.  (Complaint, ¶32.)

In approximately May 1995, a new law permitted the transfer of the Diamond License from AGE to the joint venture.  (Complaint, ¶35.)   AGE was subsequently privatized in December 1995, and became known as AGD.  (Complaint, ¶35.)

In approximately February 1996, a rich pipe of diamonds was discovered in the Verkhotina Area.  (Complaint, ¶37.)  This is when AGD is said to have begun its Illegal Scheme to deprive Archangel of its interest in the diamond discovery.  In April 1996, AGE transferred the Diamond License to AGD, which Archangel thereafter requested be transferred to AB.  (Complaint, ¶¶36, 37.)   AGD, however, threatened to transfer the Diamond License to a new company, and not AB.  (Complaint, ¶¶38, 39.)

**2.  The Colorado Connections**

In February 1997, Archangel hired a Colorado resident (Gary Davis) as Chief Financial Officer and moved its financial center from Canada to Colorado.  (Complaint, ¶¶4, 45.)  Thereafter, AGD engaged in various actions in an attempt to avoid the parties' agreement to transfer the Diamond License.  Initially, in April 1997, AGD informed Archangel that the

Diamond License would be transferred to the joint venture.  (Complaint, ¶40.)  In August 1997, however, AGD informed Archangel that it was withdrawing from the Agreement and selling its shares of AB.  (Complaint, ¶41.)[2]  AGD also sent a letter of its decision to Archangel's financial advisors, purportedly to disrupt Archangel's ability to finance the project.  (Complaint, ¶43.) However, AGD subsequently agreed to abide by the Agreement and sent Archangel a letter confirming the Agreement was in effect, and that Archangel should proceed to fund a work program.  (Complaint, ¶¶44, 91a.)  Unbeknownst to Archangel, AGD was planning to transfer its shares in AB to a newly formed subsidiary which, under Russian law, would have prohibited AGD from transferring the Diamond License to AB.  (Complaint, ¶44.)

By November 1997, Archangel hired another Colorado resident (Timothy Haddon) as the Chief Executive Officer and moved its principal place of business to Colorado.  (Complaint, ¶¶4, 45.)  On December 18, 1997, Archangel notified AGD that Archangel had moved its headquarters to Colorado.  (Complaint, ¶46.)  AGD confirmed the Diamond License would be transferred to AB following completion of and payment for the work program.  In reliance on AGD's representations, Archangel signed the work program and agreed to invest an additional $5.2 Million in funds.  (Complaint, ¶47.)  At that time, Archangel had already contributed $4.9 Million to the project.  (Complaint, ¶48.)

## B.    LUKOIL'S ACTIONS WHILE ARCHANGEL WAS IN COLORADO

### 1.    Lukoil Allegedly Joins the Illegal Scheme

In about February 1998, Lukoil, a Russian public corporation and Russia's largest oil company, obtained control over AGD by acquiring a majority of its shares and appointing a

---

[2] According to the Trust, under Russian law, AGD was required to own 50% of AB in order for the Diamond License to be transferred to AB.  (Complaint, ¶42.)

former Lukoil executive to head AGD.  Lukoil, however, assured Archangel that AGD would

honor the Agreement.  (Complaint, ¶¶4, 15, 50-53, 87.)   In a March 17, 1998 memo, AGD

stated to Archangel that the Agreement remained in effect.  (Complaint, ¶91.b.)  In a letter dated

April 3, 1998, Lukoil implied to Archangel that it would abide by the Agreement.  (Complaint,

¶52.)  By May 1998, however, AGD (allegedly under the control of Lukoil) informed Archangel

that it would not honor the Agreement and planned to transfer the Diamond License to another

entity.  (Complaint, ¶54.)  Nonetheless, between May and June 1998, AGD had communications

with Archangel concerning the ongoing status of the diamond project.  (Complaint, ¶91d & e.)

By August 1998, however, pursuant to the Agreement, Archangel initiated arbitration

proceedings in Stockholm ("Stockholm Arbitration") against AGD, Lukoil and others.  The

arbitrators decided that it had jurisdiction to hear Archangel's claim against AGD, but not

Lukoil.  (Complaint, ¶56.)   In the arbitration, AGD and Archangel agreed that Russian law

applied to their dispute and relations in general.  (ECF No. 29-20, page (p.) 4, ¶132; No. 47, p.

40 n.26.)[3]  Nonetheless, Archangel subsequently argued that Swedish law applied.  (ECF No. 47,

p. 40 n.26; No. 47-69, pp. 138-159.)

While the arbitration was pending, AGD and Archangel resolved their dispute and

entered into an agreement dated July 15, 1999 (the "1999 Agreement").  (Complaint, ¶57.)  AGD

communicated to Archangel in Colorado on many occasions between July 1999 and August

2000 concerning the diamond project.  (Complaint, ¶91j –s.)  In reliance on AGD's

communications that the agreements concerning the diamond project would be performed –

communications allegedly directed by Lukoil – Archangel funded its operations in the United

---

[3] The page references in this Order are to the page numbers as reflected in the header of the CM/ECF filing of the
particular document at issue.

States and Russia, and authorized (through the mail and wire) the transmission of funds to AGD to fund the diamond venture.  (Complaint, ¶¶91, 92.)

AGD did not, however, honor the Agreement or the 1999 Agreement and did not transfer the Diamond License to the joint venture.  Accordingly, Archangel reactivated the Stockholm Arbitration.  (Complaint, ¶63.)  AGD challenged jurisdiction again, but this time the arbitrators decided they lacked jurisdiction to hear the dispute.  (Complaint, ¶65.)  Thereafter, on November 27, 2001, Archangel filed suit against Lukoil and AGD in the District Court, City and County of Denver, Colorado, which the trial court dismissed for lack of personal jurisdiction.  (Complaint, ¶66.)  In 2000 or 2001, Lukoil acquired the remaining interest in AGD.  (Complaint, ¶50.)

### 2.  Archangel's Move Back to Canada Due to Financial Difficulties

By December 2002, after litigating[4] against AGD and Lukoil for so many years, Archangel was out of money.  Archangel was able to find investors associated with DeBeers, a large diamond producer, to provide funding to prosecute its claims, but this required Archangel to move its principal place of business backed to Canada.  (Complaint, ¶¶13, 67, 68.)

Archangel successfully appealed the arbitrators' decision and filed a renewed arbitration (Complaint, ¶69).  Archangel also successfully appealed the dismissal of the Colorado state court action but only as to Lukoil.  (Complaint, ¶70.)  Subsequent to these decisions, Archangel, DeBeers, AGD, and Lukoil attempted to resolve their dispute and the matters were effectively stayed.  When the parties were unable to resolve their dispute, Archangel resumed the Colorado state court action and the Stockholm Arbitration.  (Complaint, ¶71.)  Archangel, however, again ran out of funds.  (Complaint, ¶71.)

---

[4] Including the Stockholm Arbitration.

## C.      LUKOIL, DSE, THE "SLUSH FUND COMPANIES," AND OTHER SCHEMES

In addition to actions taken in Colorado in connection with Archangel and the Illegal Scheme involving the Diamond License, Lukoil also allegedly had other contacts in Colorado. Lukoil allegedly did business in Colorado through DSE Engineering, Inc., a Colorado corporation which has maintained an office in Colorado since February 1999, and engaged in tax fraud.  (Complaint, ¶¶19, 75, 93.)  Lukoil also allegedly funded DSE though the "Slush Fund Companies," *i.e.*, Oldberry Investments, Ltd., Gilwood Investments, Ltd., and Lukoil Israel, Ltd. (Complaint, ¶¶23-25, 75.)  These Slush Fund Companies were shells and Lukoil used them as conduits for the "Cash Smuggling," "False Expenses," "Buy High, Sell Low," and "Dividends" schemes.  (Complaint, ¶25.)  Such contacts, however, had nothing to do with the Illegal Scheme and caused no injury to Archangel or the Trust.  (ECF No. 100, p. 118.)

## II.  PROCEDURAL HISTORY

## A.      THE COLORADO STATE COURT ACTION AND BANKRUPTCY ACTION

As stated, on November 27, 2001, Archangel filed an action in the Denver District Court against Lukoil and AGD.  (Complaint, ¶9; ECF No. 29-3.)  The Colorado state court complaint alleged breach of contract against AGD, and tort based claims against AGD and Lukoil.  (ECF No. 29-3.)[5]

In 2002, the Colorado state trial court dismissed the action based on lack of personal jurisdiction as to AGD and Lukoil.  (Complaint, ¶10, 16; ECF No. 29-5.)  In 2004, the Colorado Court of Appeals affirmed (*Appeal I*).  (Complaint, ¶10; ECF No. 29-1.)  In 2005, the Colorado Supreme Court reversed as to general jurisdiction over Lukoil but affirmed the dismissal as to

---

[5] Lukoil removed the action to federal court but it was remanded upon motion filed by Archangel.  (Complaint, p. 3, ¶9.)

AGD (*Appeal II*).  (Complaint, ¶10, 70; ECF No. 29-2.)  The action was remanded to the Colorado state trial court, with Archangel as the plaintiff and Lukoil as the sole defendant. (Complaint, ¶70; *see* ECF No. 29-6.)  The Colorado state court action was informally stayed until early 2009, while the parties engaged in settlement discussions.  (Complaint, ¶11.)

With no settlement, in 2009, Archangel filed bankruptcy in Colorado and the Trust acquired Archangel's assets as successor-in-interest.  (Complaint, ¶¶5, 11, 14, 71.)  The Trust's principal place of business is in Colorado and its sole trustee is a Colorado resident.  (Complaint, ¶14.)  The Colorado state court action proceedings continued in Denver, and the parties were allowed to engage in jurisdictional discovery, including taking the deposition of Dean Sillerud, president and sole shareholder of DSE.  (*E.g.*, ECF No. 47-72.)  In November 2009, Archangel amended its Colorado state complaint ("First Amended Complaint") to add RICO and other claims.[6]  (ECF No. 29-6.)

In October 2011, after the Trust had been substituted as the plaintiff, the Colorado state trial court ("DDC") again dismissed the case against Lukoil for lack of personal jurisdiction, general or specific.  (Complaint, ¶73; ECF No. 29-8.)  The Trust appealed.  On January 6, 2012, while the Colorado appeal was pending, the Trust filed the action before this Court under the Colorado savings statute, C.R.S. § 13-80-111.  (Complaint, ¶12.)

On August 23, 2012, the Colorado Court of Appeals affirmed the dismissal of Archangel's (by now, through the Trust) claims against Lukoil.  (ECF Nos. 61, 63.)  On July 1,

---

[6] After filing its First Amended Complaint, Archangel removed the action to this court, which was then referred to the U.S. Bankruptcy Court.  The Bankruptcy Court remanded the case back to the Denver District Court.  (ECF No. 29-7.)

2013, the Colorado Supreme Court denied the Trust's petition for writ of certiorari.  (ECF No. 77.)

**B.      THE ACTION BEFORE THIS COURT**

In the action before this Court, the Trust asserts the following claims: (1) Violation of RICO § 1962(c) (Count I); (2) Violation of RICO § 1962(d) (Count II); (3) Violation of COCCA, C.R.S. § 18-17-104(3) (Count III); (4) Violation of COCCA, C.R.S. § 18-17-104(4) (Count IV); (5) Fraud and Aiding and Abetting Fraud (Count V); (6) Intentional Interference with Contractual Relations (Count VI); and (7) Unjust Enrichment (Count VII).  The Trust alleges subject matter jurisdiction based on diversity (28 U.S.C. § 1332(a)), federal question (28 U.S.C. § 1331), commerce and antitrust (28 U.S.C. § 1337(a)), and actions to prevent and restrain violations of 18 U.S.C. § 1962 (RICO) (18 U.S.C. § 1964(c)).  (Complaint, ¶7.)  The claims are substantially the same as those alleged in the First Amended Complaint before the Colorado state court.  (ECF Nos. 29-6, 29-10.)[7]  The Trust served Lukoil extraterritorially in Russia under Fed. R. Civ. P. 4(f).  (ECF Nos. 8, 9; No. 100, pp. 17, 18, 102.)

### III.  OVERVIEW:  LUKOIL'S MOTION

Lukoil moves to dismiss the Trust's Complaint based on four arguments.  First, Lukoil alleges the Complaint should be dismissed because it violates the prohibition against "claim splitting" and under the related Colorado River Doctrine.  Next, Lukoil argues it is not subject to specific or general personal jurisdiction in Colorado.  Third, Lukoil contends dismissal is appropriate under the doctrine of *forum non conveniens*.  Finally, Lukoil asserts the Trust's

---

[7] Archangel raised additional claims before the Colorado state court but this fact does not affect the Court's analysis of Lukoil's Motion.

RICO and COCCA claims are subject to dismissal for failure to state a claim and lack of

standing. The Court finds it need only address the second and third arguments.[8]

## IV. RULE 12(B)(2): PERSONAL JURISDICTION

### A.      LEGAL STANDARD – RULE 12(B)(2)

The plaintiff bears the burden of establishing personal jurisdiction over the defendant.

*Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007). When personal jurisdiction is

challenged under Rule 12(b)(2), absent an evidentiary hearing, the plaintiff need only make a

*prima facie* showing of facts that, if true, support personal jurisdiction over the defendant.

*Melea*, 511 F.3d at 1065; *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295

(10th 1999). The court accepts plaintiff's allegations as true if uncontroverted by defendant's

evidence, and resolves evidentiary disputes in favor of jurisdiction. *Melea*, 511 F.3d at 1065.

"The plaintiff may make this prima facie showing by demonstrating, via affidavit or other

written materials, facts that if true would support jurisdiction over the defendant. In order to

defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling

case demonstrating that the presence of some other considerations would render jurisdiction

unreasonable." *Omni Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir.

1998) (internal quotation marks omitted).

### B.      DATE FOR ASSESSING MINIMUM CONTACTS

The parties dispute the relevant date for assessing whether Lukoil has sufficient minimum

contacts with Colorado, or the United States, as the case may be. Lukoil contends that date

---

[8] The parties agree that claim splitting and the Colorado River Doctrine are no longer at issue (ECF No. 85, pp. 13, 25). Accordingly, these arguments are moot and will not be addressed.

should be the date when Archangel originally filed its complaint in the Colorado state court –

November 27, 2001.  The Trust contends the date should be when its complaint was filed in this

Court – January 6, 2012 – and, therefore, Lukoil's contacts with Colorado and the United States

between 2001 and 2012 should also be considered.  Under the facts and circumstances of this

case, the Court finds the relevant date to be as of November 27, 2001.

Generally, in determining personal jurisdiction, the contacts of the defendant with the

forum state are to be assessed as of the time suit was filed.  *See Metropolitan Life Ins. Co. v.*

*Robertson-Ceco Corp.*, 84 F.3d 560, 569-570 (2nd Cir. 1996) ("In general jurisdiction cases

district courts should examine a defendant's contacts with the forum state over a period of time

that is reasonable under the circumstances – up to and including the date suit was filed…."); 

*Cameron v. Group Voyagers, Inc.*, 308 F. Supp.2d 1232, 1240 (D. Colo. 2004) (post-suit

contacts could not be used as basis for exercising general personal jurisdiction over nonresident

defendant in diversity case); *Fairbrother v. American Monument Foundation, LLC*, 340 F.

Supp.2d 1147, 1157 n.3 (D. Colo. 2004) (noting that only prelitigation contacts are relevant to

jurisdictional question).

In this case, two actions were filed.  Archangel filed before the Colorado state court in

2001 and the Trust – as successor-in-interest – filed before this Court in 2012.  The Trust's

Complaint, however, was filed pursuant to C.R.S. § 13-80-111, the Colorado savings statute.

(Complaint, p. 3, ¶12.)  Under that statute, if an action commenced in a Colorado court is

dismissed because of lack of jurisdiction, the plaintiff may commence a new cause of action

"within ninety days after the termination of the original action or within the period otherwise

allowed by this article [80], whichever is later…."  C.R.S. § 13-80-111(1).  The action before

this Court is therefore, in effect, the same action that was that filed in 2001 in the Colorado state

court.  Accordingly, the Court finds that the general rule applies and Lukoil's contacts with the

forum as of November 27, 2001 control.  In addition, the Court finds the "curable-defect

doctrine" would not apply to allow the Trust to utilize contacts subsequent to the original 2001

filing to support a finding of jurisdiction.  Under that doctrine, suit may be brought *again* where

a jurisdictional defect has been cured or loses its controlling force based on changes in

circumstances which occur *subsequent* to the prior litigation.[9]  *Park Lake Resources Ltd. Liab.*

*Co. v. U. S. Dept. of Ag.,* 378 F.3d at 1132, 1137 (10th Cir. 2004); *Eaton v. Weaver Mfg. Co.,* 582

F.2d 1250, 1256 (10th Cir. 1978).  As these facts are not present in this case, Lukoil's contacts

subsequent to the filing of the 2001 complaint are irrelevant to the jurisdictional analysis.[10]

## C.   PERSONAL JURISDICTION IN DIVERSITY ACTION

### 1.  The Standard

In a diversity action, to obtain personal jurisdiction over a nonresident defendant, two

criteria must be met:

> First, a federal district court may only exercise personal jurisdiction over a defendant who
> could be subjected to the jurisdiction of a court of general jurisdiction in the state in
> which the district court is located. . . . Second, an exercise of personal jurisdiction under
> state law must comport with the Fourteenth Amendment's due process clause. . . . In
> Colorado, only one inquiry is necessary, as the Colorado long-arm statute confers the
> maximum jurisdiction permitted by the due process clauses of the United States and
> Colorado constitutions, and its requirements are necessarily addressed under a due
> process analysis.

*Melea,* 511 F.3d at 1065 (internal quotation marks, citations and alterations omitted); *Benton v.*

*Cameco Co*rp*.,* 375 F.3d 1070, 1075 (10th Cir. 2004), *cert denied*, 544 U.S. 974 (2005).

---

[9] This doctrine is generally raised as to whether issue preclusion applies, *i.e.*, whether a court's determination that it lacks jurisdiction in the first action bars relitigation of that issue in a subsequently filed second action.
[10] The Trust represents the Colorado state courts also concluded contacts would be considered only up to the date the suit was filed.  (*E.g.*, ECF No. 100, p. 140, ll. 7-10.)

A two-step analysis is conducted when evaluating personal jurisdiction under the due process clause. At the first step, the Court examines "'whether the non-resident defendant has 'minimum contacts' with the forum state such that he should reasonably anticipate being haled into court there.'" *Melea*, 511 F.3d at 1065 (quoting *TH Agric. & Nutrition, LLC v. Ace European Group, Ltd.*, 488 F.3d 1282, 1287 (10th Cir. 2007)). If the defendant has sufficient contacts, the Court moves on to the second step and asks "whether the court's exercise of jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice,' that is, whether the exercise of jurisdiction is 'reasonable' under the circumstances." *Melea*, 511 F.3d at 1066 (some internal quotation marks omitted).

"The 'minimum contacts' test may be met in either of two ways. First, if a defendant has 'continuous and systematic general business contacts' with the forum state, it may be subjected to the *general* jurisdiction of the forum state's courts." *Melea*, 511 F.3d at 1066 (emphasis added). Second, if a defendant "purposefully directed" its activities at the state's residents, and if the cause of action arises out of those activities, it may be subjected to the *specific* jurisdiction of the forum state's courts. *Melea*, 511 F.3d at 1066; *Benton*, 375 F.3d at 1076.

For *specific* personal jurisdiction, in the tort context, the court asks whether the nonresident defendant "purposefully directed" its activities at the forum state. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). In contract cases, the courts "sometimes ask whether the defendant 'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state." *Id.*

## 2.  Specific Jurisdiction

Lukoil argues the Colorado state courts have already determined that Archangel did not establish specific jurisdiction over Lukoil so the Trust is precluded from relitigating all discussions of specific jurisdiction under the doctrine of collateral estoppel or issue preclusion. Specifically, Lukoil argues that the Colorado state courts already decided that the alleged fraudulent communications into Colorado as part of the Illegal Scheme were insufficient to establish a *prima facie* case of specific jurisdiction and in *Appeal II* the Colorado Supreme Court already addressed the "effects test" under *Calder v. Jones*, 465 U.S. 783 (1984).  In response, the Trust contends the Colorado court decided specific jurisdiction under Colorado's long-arm statute and the Fourteenth Amendment, but did not address whether specific jurisdiction may exist pursuant to RICO and the Fifth Amendment.[11]  Upon an examination of the record, the Court agrees the issue of whether Lukoil is subject to specific personal jurisdiction has already been decided, and the Trust is precluded from relitigating the same.[12]

"[I]ssue preclusion bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim." *Park Lake*, 378 F.3d at 1136.  Generally, issue preclusion applies if four factors are met: "(1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity

---

[11] To the extent the Trust is arguing jurisdiction under Fed. R. Civ. P. 4(k)(1)(C) ("when authorized by a federal statute," *i.e.*, RICO) or 4(k)(2), those arguments are addressed below.

[12] In its Supplement, the Trust concedes the Colorado state court's decision precludes specific jurisdiction under the Colorado long-arm statute.  (ECF No. 88, pp. 6, 7).  In light of subsequent arguments, however, it was unclear whether the Trust was nonetheless attempting to reargue the matter.  As such, the Court will address the issue.

to litigate the issue in the prior action." *Park Lake,* 378 F.3d at 1136.  In the case of dismissals

for lack of jurisdiction, issue preclusion prevents a party from relitigating the issues determined

in ruling on the jurisdiction question.  *Park Lake,* 378 F.3d at 1136; *Monsantos Commercial*

*Corp. v. Applebee's Int'l, Inc.*, 245 F.3d 1203, 1209-1210 (10th Cir. 2001).

The Court's review of the record shows the Colorado state courts decided the issue of

whether Archangel failed to establish a *prima facie* case of specific jurisdiction under Colorado's

long-arm statute and the Fourteenth Amendment and, in doing so, considered Archangel's (and,

now the Trust as successor-in-interest) allegations of an illegal scheme and the *Calder* effects

test.  (*E.g.,* ECF No. 29-1, *Appeal I*, pp. 9-12; No. 29-2, *Appeal II,* pp. 9, 10, 13, 14*;* No. 29-8,

DDC, pp. 5-7, 10, 16.)  The Trust argues these determinations are no barrier to the issue it raises

as this Court decides specific jurisdiction related to RICO under the Fifth Amendment, relying

on *Dudnikov, Ast Sports  Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054 (10th Cir. 2008), and

*Calder.*  The problem with the Trust's argument is that these cases were analyzed under the

*Fourteenth Amendment,*[13] an analysis already conducted by the Colorado state courts in favor of

Lukoil.  Concomitantly, the Trust has not shown how the *Calder* test would be applied

differently under the Fifth Amendment.[14]  Instead, the Trust's position that the Colorado state

courts did not apply the standard for tort based (as opposed to contract based) specific personal

jurisdiction is nothing more than an argument that one or more of those courts erred in their

analysis of whether such jurisdiction exists.  (*E.g.*, ECF No. 100, pp. 48, 153.)  An argument

---

[13] *Dudnikov* and *Ast Sports* both analyzed the jurisdictional issue under the Colorado long-arm statute.  *Dudnikov,* 514 F.3d at 1070; *Ast Sports*, 513 F.3d at 1057.  That is not to say, however, that principles applicable under the Fourteenth Amendment may not be applicable under the Fifth Amendment.  *See Peay v. Bellsouth Med. Assist. Plan*, 205 F.3d 1206, 1211-1212 (10th Cir. 2000).

[14] Indeed, the Trust argues the test is the traditional analysis under *International Shoe Co. v. State of Wash.*, 326 U.S. 310 (1945) (the analysis for specific jurisdiction under the Fourteenth Amendment) and concedes it is the same test. (ECF No. 100, pp. 10, 152.)

made by Archangel and the Trust before the Colorado courts, and considered and rejected by those courts.  (*See, e.g.,* ECF No. 29-9, p. 6; No. 63-1, pp. 41, 43.)  And, an analysis the Trust is asking this Court to now conduct anew but which it cannot.  The issue of whether specific personal jurisdiction exists in Colorado has already been decided under the *Calder* effects test and otherwise; therefore, the Trust is precluded from relitigating it before this Court.

### 3.   General Jurisdiction

The Trust argues that Lukoil is subject to general jurisdiction under agency and alter ego theories, as Lukoil allegedly used DSE to avail itself of the privilege of doing business in Colorado.  As with specific personal jurisdiction, Lukoil argues that the Trust's allegations to support general personal jurisdiction are identical to those asserted by Archangel in Colorado state court and the DDC's determination precludes the Trust from arguing general jurisdiction premised on the alleged schemes.  After examining the record, the Court agrees.  The arguments raised by the Trust are the same as those raised before the DDC.  And, the issue which the Trust asks this Court to address is the same as that decided by the DDC – whether Lukoil is subject to general personal jurisdiction under agency, alter ego, and illegality theories.[15]  (ECF No. 47, pp. 30-33; ECF No. 29-8, pp. 6-13.)  Accordingly, the Trust is barred from relitigating the issue of whether Lukoil is subject to general personal jurisdiction in Colorado.  Lukoil is not and, accordingly, the Trust may not rely on the exercise of personal jurisdiction on this basis.

---

[15] This finding is based on the Court's determination that "contacts" post-November 2001 are irrelevant.

### D.      PERSONAL JURISDICTION BASED ON FEDERAL LAW

#### 1.   Jurisdiction Based on RICO

In an action based on a federal question, "[i]n determining whether a federal court has personal jurisdiction over a defendant, the court must determine (1) whether the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process." *Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006); *Peay v. Bellsouth Med. Assist. Plan*, 205 F.3d 1206, 1209 (10th Cir. 2000). Thus, pursuant to Rule 4(k)(1)(C), "[s]erving a summons or filing of a waiver of service establishes personal jurisdiction over a defendant … when authorized by a federal statute." "While service of process and personal jurisdiction both must be satisfied before a suit can proceed, they are [nonetheless] distinct concepts that require separate inquiries." *Peay*, 205 F.3d at 1209. "'When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction.'" *Peay*, 205 F.3d at 1210 (quoting *Republic of Panama v. BCCI Holdings (Luxemborg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997)). "[P]rovided that due process is satisfied, [such statute] confers jurisdiction over defendants by authorizing service of process on them." *Peay*, 205 F.3d at 1210; *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1229 (10th Cir. 2006), *cert. denied*, 550 U.S. 918 (2007).

In this case, 18 U.S.C. § 1965(b) gives RICO nationwide jurisdictional reach. *Aztec Steel Bldg.*, 468 F.3d at 1229. Lukoil contends RICO does not confer jurisdiction because it does not authorize worldwide service of process. The Court agrees. The Trust's argument that the application of RICO and the Fifth Amendment confers specific personal jurisdiction in Colorado pursuant to the *Calder* effects test was previously addressed and rejected. To the extent the

17

Trust's argument is also based on the proposition that jurisdiction exists under RICO's authorization for service of process, that argument is also rejected.  In this case, Lukoil was served in Russia, and there is no contention that RICO authorizes *worldwide* service of process.

### 2.  Jurisdiction under Fed. R. Civ. P. 4(k)(2)

Pursuant to Rule 4(k)(2), "[f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."  This Rule "serves as a federal long-arm statute, which allows a district court to exercise personal jurisdiction over a foreign defendant whose contacts with the United States, but not with the forum state, satisfy due process."  *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico*, 563 F.3d 1285, 1296 (Fed. Cir. 2009).  The parties agree that three conditions must be satisfied in order for this Rule to apply, but dispute who bears the burden and whether such conditions are met.

### a)  Claim under Federal Law

Lukoil argues the Trust fails to state a claim for RICO so there is no claim which arises under federal law on which personal jurisdiction under Rule 4(k)(2) can be based.  Personal jurisdiction, however, "is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication" of a case.  *Tuhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (internal quotation marks and alterations omitted); *Arocho v. Lappin*, 461 Fed. Appx. 714, 719 (10th Cir. 2012).  Once a court determines it lacks jurisdiction over a claim, it lacks jurisdiction to make any determination of the merits of the underlying

claim. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1217 (10th Cir. 2006) (discussing

dismissal for lack of subject matter jurisdiction).

Lukoil contends the Court may first determine whether a plaintiff successfully asserts a

RICO claim before considering personal jurisdiction, relying on *Shell v. Am. Family Rights*

*Ass'n*, No. 09-cv-00309, 2010 WL 1348548, at *12 (D. Colo. Mar. 31, 2010), and the Trust did

not argue otherwise.  *Shell*, however, never analyzed whether or when it would be permissible

for the court to decide whether a RICO claim was stated before turning to the issue of personal

jurisdiction based on RICO.  The Court finds that to decide a Rule 12(b)(2) based on an analysis

under Rule 12(b)(6) would essentially conflate two different analysis.  Instead, the Court agrees

with the analysis conducted by the Eleventh Circuit in *Republic of Panama*:

> When a jurisdictional motion to dismiss depends…on the assertion of a right
> created by a federal statute, the court should dismiss for lack of jurisdiction only
> if the right claimed is so insubstantial, implausible, foreclosed by prior decisions
> of this Court, or otherwise devoid of merit as not to involve a federal controversy.

*Republic of Panama*, 119 F.3d at 941 (internal quotation marks omitted).  This analysis is

identical to that used by the Tenth Circuit in determining whether a proceeding fails to present a

colorable claim arising under federal law sufficient to invoke a court's subject matter jurisdiction

based on federal question.  *McKenzie v. U.S. Citizenship & Immigration Servs.*, 761 F.3d 1149,

1156-1157 (10th Cir. 2014).  Accordingly, the Court finds that a determination of the merits of

the Trust's claim is inappropriate before determining whether this Court has jurisdiction to

decide the claim.

In this case, facially, the Trust has arguably pleaded a colorable RICO claim as to

Lukoil's alleged engagement in the Illegal Scheme, *see Robbins v. Wilkie*, 300 F.3d 1208, 1210

(10th Cir. 2002) (identifying four elements of a RICO claim), and the parties have not argued

otherwise.[16]  On the other hand, the Trust has not done so as to the other schemes alleged as it lacks standing to bring claims based on schemes from which it admittedly suffered no injury (Complaint, ¶¶134, 138; ECF No. 100, p. 118).  *See Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 276 (1992) ("We hold that, because the alleged [conduct] did not proximately cause the injury claimed, [plaintiff's] allegations and the record before us fail to make out a right to sue….."); *Tal v. Hogan*, 453 F.3d 1244, 1254 (10th Cir. 2006), *cert. denied*, 549 U.S. 1209 (2007) ("[S]tanding for private individuals under RICO requires a plaintiff to have been injured in his business or property by the conduct constituting the violation.") (internal quotation marks omitted).  Nonetheless, based on the alleged Illegal Scheme, the first condition is satisfied for jurisdictional purposes.

### b)  Not Subject to Jurisdiction in Any Other State's Court of General Jurisdiction

Lukoil argues the burden is on the Trust to establish that Lukoil is not subject to a court of general jurisdiction anywhere in the United States, and the Trust cannot meet its burden when: (1) it asserts that Colorado's long-arm statute confers jurisdiction; and (2) it asserts Lukoil has contacts through its agents or alter egos.  In response, the Trust argues that Lukoil has already stated it is not subject to personal jurisdiction in any state, and such admission is sufficient.

In deciding this issue, the Court must first resolve who bears the burden of showing a lack of personal jurisdiction over a defendant in any state – the "negation requirement."  *Synthes*, 563 F.3d at 1294.  Neither party has directed the Court to any case from the Supreme Court or Tenth Circuit on this issue, and the Court's independent investigation revealed none.  In *Pandaw*

---

[16] Indeed, Lukoil's Rule 12(b)(6) motion initially did not challenge the adequacy of the Trust's RICO allegations. (ECF No. 29.)

*America, Inc. v. Pandaw Cruises India Pvt. Ltd.*, 842 F. Supp.2d 1303 (D. Colo. 2012), however, the Honorable William J. Martinez from this district adopted the rationale from the Seventh Circuit in *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir. 2001). After a review of cases from other Circuits and the different methods for determining whether the negation requirement is met, *see, e.g., Synthes,* 563 F.3d at 1294-1295 (describing various approaches taken by different circuits), the Court agrees with the approach taken by the Seventh and some other Circuits, and by Judge Martinez

Normally, the plaintiff bears the burden of proving personal jurisdiction over the defendant. *E.g., Dudnikov,* 514 F.3d at 1069. Here, if the Court were to follow the "normal" route for the negation requirement, the plaintiff would have to prove the defendant is not subject to personal jurisdiction in any of the 50 states. This burden could be onerous as it is generally the defendant who possesses this information. This burden could also present practical difficulties for the plaintiff who pleads in the alternative that the defendant is subject to suit under a state's long-arm statute. *Synthes*, 563 F.3d at 1294. The record in this case shows such are the circumstances here.

On the other hand, shifting the burden to the defendant "requires that the defendant concede its potential amenability to suit in federal court (by denying its amenability to suit in any state court) or submitting to jurisdiction in a particular state, an uninviting choice." *Touchcom, Inc. v. Bereskin & Parr,* 574 F.3d 1403, 1413 (Fed. Cir. 2009). Nonetheless, Rule 4(k)(2) was added to close a loophole which existed prior to the 1993 amendments to the Federal Rules of

Civil Procedure.  Specifically,

> This paragraph corrects a gap in the enforcement of federal law.  Under the
> former rule, a problem was presented when the defendant was a non-resident of
> the United States having contacts with the United States sufficient to justify the
> application of United States law and to satisfy federal standards of forum
> selection, but having insufficient contact with any single state to support
> jurisdiction under state long-arm legislation or meet the requirements of the
> Fourteenth Amendment limitation on state court territorial jurisdiction.  In such
> cases, the defendant was shielded from the enforcement of federal law by the
> fortuity of a favorable limitation on the power of state courts, ….

Advisory Committee Notes on Fed. R. Civ. P. 4(k)(2), 146 F.R.D. 401, 571 (1993).  These

comments are entitled to weight in consideration of the application of the Rule.  *See generally*

*Schiavone v. Fortune*, 477 U.S. 21, 31 (1986) ("[T]he construction given by the [Advisory]

Committee is 'of weight.'") (quoting *Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438,

444 (1946)); *Esposito v. United States*, 368 F.3d 1271, 1275 (10th Cir. 2004) ("Courts have . . .

looked to the Advisory Committee Notes accompanying the Rule [17(a)] to provide parameters

for its application.").

> Accordingly, the Court finds that:

> [a] defendant who wants to preclude use of Rule 4(k)(2) has only to name some
> other state in which the suit could proceed.  Naming a more appropriate state
> would amount to a consent to personal jurisdiction there (personal jurisdiction,
> unlike federal subject-matter jurisdiction, is waivable).  If, however, the defendant
> contends that he cannot be sued in the forum state and refuses to identify any
> other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).  .
> . .  This procedure makes it unnecessary to traipse through the 50 states, asking
> whether each could entertain the suit.

*ISI Int'l*, 256 F.3d at 552.[17]

---

[17] In this case, evidence that Lukoil opened an office in the New York in June 1998 (ECF No. 47-20) raises a
question as to whether it may have been subject to personal jurisdiction in New York in 2001.  However, neither
party has asserted Lukoil was subject to the court of general jurisdiction in New York, and Lukoil has implicitly
stated it is not.  Further, the opening of an office, without more, is insufficient to establish general personal
jurisdiction over an otherwise foreign defendant.  *See Doering v. Copper Mountain, Inc.*, 259 F.3d 1202, 1210 (10th

In this case, Lukoil "maintains … now, and it maintained in 2001, that it is not subject to jurisdiction anywhere in the United States."  (ECF No. 100, pp. 30-31; *see* No. 101, p. 2 ("Lukoil is not 'essentially at home' in Colorado *or* anywhere else in the United States to render it 'comparable to a domestic enterprise.'") (emphasis in original).)  Under the approach adopted in *ISI Int'l,* shifting of the burden to Lukoil shows the second requirement under Rule 4(k)(2) is met.

Lukoil's *concession*, however, can also be viewed as evidence that the Trust has met its burden, if the burden was its to bear.  In this case, before the Court made any determination as to who bears the burden of showing Rule 4(k)(2) has been satisfied, Lukoil admitted it was not subject to any state's court of general jurisdiction.  Whether such an admission is an evidentiary or a judicial one, it obviated the Trust's need to conduct discovery or litigate in 50 states to establish a fact at issue.  Such admission in this context is no different from any other party opponent admission – it alleviates the party who bears the burden of proof from having to establish the fact so admitted.  A party-opponent's admission operates as "a kind of estoppel or waiver theory" – "that a party should be entitled to rely on his opponent's statements."  *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 667 (10th Cir. 2006) (discussing admissibility of party-opponent admissions) (internal quotation marks omitted).  And, "[j]udicial admissions are formal admissions which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Grynberg v. Bar S Servs., Inc.*, 527 Fed.

---

Cir. 2001) ("Whether the [defendant] solicits business in [the forum] through a local office or agents" is *one* factor to consider in assessing contacts for general jurisdiction.).  As for other evidence of contacts in the United States, such evidence, by itself, does not show an inconsistency with concluding that Lukoil is not subject to the general jurisdiction of any state.  For example, evidence that Lukoil acquired Getty Petroleum Marketing, Inc. in the U.S. and that *Getty* sells petroleum products in gasoline filling stations in several states, without more, does not support a finding that *Lukoil* does business in such states.  (*E.g.*, ECF No. 47-6, pp. 2, 4, 6, 7.)

Appx. 736, 739 (10th Cir. June 11, 2013) (internal alteration and quotation marks omitted).

Accordingly, the Court finds the second requirement is satisfied, regardless of who bears the

burden.[18]

### c)  Consistent with the Constitution – The Due Process Clause of the Fifth Amendment.[19]

Lukoil contends that the Colorado state courts' determination that it would be

unconstitutionally burdensome for Lukoil to defend here bars the Trust from relitigating that

issue before this Court.  Lukoil argues that under *Peay*, for purposes of jurisdictional analysis,

there is no difference between due process under the Fifth Amendment and due process under

the Fourteenth Amendment.  If it is unconstitutional under the Fourteenth Amendment, then it is

also unconstitutional under the Fifth Amendment, so states Lukoil.  The Court finds otherwise.

First, as recognized by the Advisory Committee:

> There remain constitutional limitations on the exercise of territorial jurisdiction by
> federal courts over persons outside the United States.  These restrictions arise
> from the *Fifth Amendment* rather than from the Fourteenth Amendment, which
> limits state-court reach and which was incorporated into federal practice by the
> reference to state law in the text of the former subdivision (e) that is deleted by
> this revision.  The Fifth Amendment requires that any defendant have *affiliating
> contacts with the United States* sufficient to justify the exercise of personal
> jurisdiction over that party.  There also may be a further Fifth Amendment
> constraint in that a plaintiff's forum selection might be so inconvenient to a
> defendant that it would be a denial of "fair play and substantial justice" required
> by the due process clause, even though the defendant had significant *affiliating
> contacts with the United States*.

---

[18] Legal arguments or propositions of law do not constitute judicial admissions, *Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*, 10 F.3d 700, 716 (10th Cir. 1993), *modified in part on other grounds on reh'g*, 39 F.3d 1078 (10th Cir. 1994) (en banc), but the Court finds in this instance that Lukoil's statements before the Court conceded the issue.

[19] Rule 4(k)(2) also requires that exercising jurisdiction must be consistent with the "laws" and, although raised by the Court at oral argument, Lukoil has not argued that the exercise of jurisdiction would be or not be consistent with the laws.  In fact, the parties' papers do not address this requirement at all.  Therefore, the Court will assume that the exercise of personal jurisdiction over Lukoil would be consistent with any "laws."

Advisory Committee Notes, 146 F.R.D. at 571-572 (internal citation omitted) (emphasis added).

Thus, under Rule 4(k)(2), the Court must consider national contacts with the United States,

rather than contacts with the forum state.  *Pandaw*, 842 F. Supp.2d at 1311; *see Republic of*

*Panama*, 119 F.3d at 945 n.16 (relevant forum under the Fifth Amendment is the United States).

And, under the national contacts test, a district court may constitutionally exercise jurisdiction

over a defendant as long as it has minimum contacts with the United States as a whole,

"regardless of a defendant's contacts with the forum [state] or the burden on the defendant of

litigating in that forum." *Peay*, 205 F.3d at 1211.  Under this part of the analysis, there is no

requirement that there be any contacts at all with the forum *state*, "even though it is a relevant

factor to consider." *Touchtone Group, LLC v. Rink,* 913 F. Supp.2d 1063, 1072 (D. Colo.

2012).[20]

Next, *Peay* does not sweep as broadly as Lukoil contends.  While *Peay* recognized that

the Due Process Clauses of the Fourteenth and Fifth Amendments "are virtually identical" and

designed to "protect individual liberties from the same types of government infringement," *Peay*,

205 F.3d at 1212, the factors which the Tenth Circuit outlined in determining whether the

defendant has demonstrated that its liberty interests have been infringed under the Fifth

Amendment are not the same factors used in determining whether those interests are infringed

under the Fourteenth Amendment.  *Cf. Peay*, 205 F.3d at 1212 (outlining five factors for

consideration under the Fifth Amendment in determining jurisdiction over a domestic

---

[20] In *Peay*, the Tenth Circuit stated that due process under the Fifth Amendment requires "something more" than "national contacts." *Peay*, 205 F.3d at 1211.  *Peay*, however, was applying the due process analysis to a *domestic* defendant, which, by necessity, would have sufficient contacts in at least one state in the United States.  In contrast, under Rule 4(k)(2), by definition, the foreign defendant has insufficient contacts in any state, which is the very "gap" this rule was designed to cover.  By its requirements, Rule 4(k)(2) could only be applied to a foreign defendant.  In addition, the "something more" is the "fair and reasonable" requirement which the Tenth Circuit identified should be addressed.  *Peay*, 205 F.3d at 1212.

corporation) *with, e.g., Dudnikov*, 514 F.3d at 1080 (outlining factors under the Fourteenth Amendment).  Moreover, even if a defendant establishes constitutional "inconvenience," jurisdiction will still comport with due process "if the federal interest in litigating the dispute in the chosen forum outweighs the burden imposed on the defendant." *Peay*, 205 F.3d at 1213.

Third, under Lukoil's theory that the Due Process Clauses under the Fifth and Fourteenth Amendment are identical, if a defendant is not subject to personal jurisdiction under a state's long-arm statute as violative of the Due Process Clause under the Fourteenth Amendment, that defendant would necessarily also not be subject to jurisdiction under Rule 4(k)(2).  Such a result would effectively render Rule 4(k)(2) moot in Colorado.  Accordingly, the Court must conduct its own analysis to determine whether the exercise of personal jurisdiction comports with the Due Process Clause of the Fifth Amendment.

Before it reaches the *Peay* factors, the Court must consider the "minimum contacts" analysis to be conducted under general or specific jurisdiction.  The Trust argues that a specific jurisdiction analysis is required (ECF No. 100, p. 11), but contends a "less rigorous" general jurisdiction analysis is sufficient in one response (ECF No. 47, p. 24), and then argues specific and general jurisdiction in a supplemental response (ECF No. 102).  Lukoil, on the other hand, argues that it is not subject to specific jurisdiction and, therefore, the Trust must satisfy the test for general jurisdiction (ECF No. 29, p. 20).  At the time Lukoil made that argument, however, the Colorado Court of Appeals had not yet issued its decision finding Lukoil was not subject to general jurisdiction.  Therefore, the Court assumes that Lukoil's current position as to general jurisdiction is the same as that for specific jurisdiction, *i.e.*, that the issues have already been decided by the Colorado courts and cannot be relitigated.  That position, however, is rejected for

reasons previously discussed, *e.g.,* while the Fourteenth and Fifth Amendments may be "nearly identical," they are not identical; the Colorado state courts analyzed Lukoil's contacts with Colorado as the relevant "forum" but under Rule 4(k)(2), while Lukoil's contacts with Colorado may be relevant in assessing whether the exercise of personal jurisdiction would be "reasonable," it is Lukoil's contacts with the *United States* which is the relevant forum for assessing minimum contacts.[21]  On this record, the Court will conduct an analysis under general and specific jurisdiction.

### (1) Minimum Contacts – General Jurisdiction

Lukoil argues the traditional "continuous and systematic general business contacts" test applies, and that it is not "at home" in Colorado or anywhere else in the United States.  The Trust asserts a lesser standard is required, apparently relying on *Synthes'* reference to the Advisory Committee's comment that "[t]he Fifth Amendment…requires that any defendant have *affiliating* contacts with the United States." *Synthes*, 563 F.3d at 1295 (emphasis added).[22] Nonetheless, the Trust contends Lukoil's contacts satisfy the "continuous and systematic" standard.   To satisfy this standard, a defendant's "affiliations" with the forum must be "'so 'continuous and systematic' as to render it essentially at home in the forum State.'" *Daimler AG*

---

[21] It appears that Lukoil's initial position was that a national contacts test applied (ECF No. 29, pp. 18, 20), but then subsequently changed its positon, arguing that the Tenth Circuit disavowed this test in *Peay* (ECF No. 100, pp. 21, 22).  Regardless, as discussed herein, the Court finds that where jurisdiction is based on Rule 4(k)(2), national contacts are to be analyzed.  *Synthes*, 563 F.3d at 1295; Advisory Committee Notes, 146 F.R.D. at 571.

[22] In *Synthes*, the Federal Circuit began with the traditional minimum contacts analysis under *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), recognizing that, depending on their quality and quantity, a defendant's contacts with a forum can provide a court with general or specific jurisdiction.  Although the Federal Circuit quoted the Advisory Committee's comments concerning "affiliating contacts," it then went on to analyze the contacts under the "continuous and systematic general business contacts" test for general jurisdiction and the "purposefully directed" test for specific jurisdiction.  *Synthes*, 563 F.3d at 1296, 1297.  In other words, the *Synthes* court implicitly recognized – as does this Court – that the "affiliating contacts" referenced are the "traditional" contacts used to assess minimum contacts, not a lesser standard.

*v. Bauman*, __ U.S. __, 134 S.Ct. 746, 761 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, __ U.S. __, 131 S.Ct. 2846, 2851 (2011)) (internal brackets omitted).

The Tenth Circuit has established several factors to consider in deciding whether general jurisdiction has been established against a non-resident corporate defendant, including: "(1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state, through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation."  *Grynberg v. Ivanhoe Energy, Inc.*, 490 Fed. Appx. 86, 95 (10th Cir. July 12, 2012), *cert. denied*, 133 S.Ct. 941 (2013) (quoting *Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 457 (10th Cir. 1996)); *Doering*, 259 F.3d at 1210.

In this case, the Trust relies on allegations of the contacts of Lukoil, and its alleged alter egos and agents,[23] to show that sufficient national contacts exist.  An examination of each contact, singly and in the aggregate, shows they are insufficient to establish that Lukoil's affiliations with the United States as of November 27, 2001 were so "continuous and systematic" as to render it "at home" in the United States.

The Level-1 American Depository Receipts ("ADR-1s"):

The Trust argues that Lukoil established an ADR program to gain access to U.S. capital markets and contacts related to such program are sufficient to establish a *prima facie* case of jurisdiction.  While the Court finds that Lukoil's contacts with respect to the sponsorship of

---

[23] The Trust also argues that Lukoil is subject to general jurisdiction based on its *de facto* Colorado office from December 1, 2001 onward.  Such argument cannot be sustained as any contacts after November 27, 2001 ceased to be jurisdictionally relevant.

28

ADR-1s may properly be considered to show "continuous and systematic" general business contacts, they are not, by themselves, sufficient to establish general personal jurisdiction.

ADRs are "negotiable instrument[s] issued by an American bank as a substitute for stock shares in a foreign-based corporation."  Black's Law Dictionary 101 (10th ed. 2014).  They are "the most common method by which foreign companies secure American shareholders."  *Id.*; *see Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3rd Cir. 2002) (ADRs are "one of the preferred methods for trading foreign securities in the United States.").  "ADRs are tradeable in the same manner as any registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the Securities Act and the Exchange Act."  *Pinker*, 292 F.3d at 367.  "ADRs may be either sponsored or unsponsored.  An unsponsored ADR is established with little or no involvement of the issuer of the underlying security.  A sponsored ADR, in contrast, is established with the active participation of the issuer of the underlying security.  [That issuer] enters into an agreement with the depositary bank and the ADR owners.  The agreement establishes the terms of the ADRs and the rights and obligations of the parties, such as the ADR holders' voting rights."  *Pinker*, 292 F.3d at 367 (internal citations omitted).

There are a few jurisdictions which have considered when ADRs may support the exercise of personal jurisdiction over a foreign defendant.  The Trust relies on *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000), *cert. denied*, 532 U.S. 941 (2001), while Lukoil relies on *Pieczenik v. Cambridge Antibody Tech. Grp.*, 2004 WL 527045 (S.D.N.Y. Mar. 16, 2004), a case which relies on the general proposition cited in *Wiwa*.  In *Wiwa*, the Second Circuit stated:

> We agree that the prevailing caselaw accords foreign corporations substantial latitude to list their securities on New York-based stock exchanges and to take the steps necessary to facilitate those listings (such as making SEC filings and designating a depository for their shares) without thereby subjecting themselves to New York jurisdiction for unrelated occurrences. . . . [However,] it is not that activities necessary to maintain a stock exchange listing do not count, but rather that, without more, they are insufficient to confer jurisdiction.

*Wiwa*, 226 F.3d at 97.  The court went on to find sufficient contacts to establish general jurisdiction because the defendants: (1) had an investor relations office[24] which conducted a "broader range of activities" than those "merely incidental to the stock exchange listing," *i.e.,* those which resulted "from legal or logistical requirements incumbent upon corporations that list their shares on the New York Stock Exchange"; and (2) had a "substantial 'physical corporate presence'" in New York which promoted the defendants' interests.  *Wiwa*, 226 F.3d at 97-98.

In this case, Lukoil issued sponsored ADR-1s in the United States, first in 1995 and then again in 1997.  (*E.g.,* ECF No. 29-16, p. 3, ¶4; No. 47-19, p. 1; No. 47-20, p. 1.)  Lukoil also engaged in activities that are necessary to facilitate those listings.  (*E.g.,* ECF No. 47-27.)[25]  One 2006 paper regarding "Capital Day" – a day for Lukoil's management to present its "capital program" and "policy on investor relations" – contains a reference that it is Lukoil's "regular tradition" to present its annual report in New York and, impliedly, that it has done so for the last 10 years.  (ECF No. 47-63, p. 1.)  However, as of November 27, 2001, Lukoil had not done much *more*.  The Trust relies on the maintenance of an investor relations person, but states that was from 2003 forward.  The Trust also relies on assertions that Lukoil sent "CEO Alekperov" and "Officer Fedun" to the United States from the mid-1990s forward, but a review of the

---

[24] The program was run through agents of the defendants for jurisdictional purposes.

[25] This particular registration was filed in 2003 but the Court finds it nonetheless persuasive to support the Trust's argument that Lukoil would have had to also do so in the 1990s, after it issued its sponsored ADR-1s.

referenced exhibits do not support such assertion.  Similarly, the Court was also unable to find support in the referenced materials for the Trust's contention that Lukoil hosted "Investors Day" and road shows in the United States since "apparently the mid 1990's."[26]  Therefore, while Lukoil's sponsorship of ADR-1s is of jurisdictional significance, it is, by itself, insufficient to confer general jurisdiction.

The U.S. Real Estate

In 1998, Lukoil issued a press release that it opened an office in New York.  (ECF No. 47-20, p. 1.)  The Trust argues that this announcement, coupled with the maintenance of an office "technically owned" by Lukoil Pan Americas LLC ("Pan Americas"), shows the continuous operation of an office sufficient to establish jurisdiction.  The Court finds otherwise.  First, Pan America's lease was signed in 2009, after the relevant time period.  (ECF No. 47-40.)  Next, Lukoil has not sufficiently shown, by allegations or otherwise, Pan America's lease of an office in 2009 constitutes a *continuous* operation of an office by Lukoil in New York from 1998 forward.  Nonetheless, the Court agrees that Lukoil's announcement that it opened an office in New York in 1998 is a relevant factor to assess whether Lukoil's affiliations with the United States are so "continuous and systematic" to render it essentially "at home."

The U.S. Gas Station Network

The Trust argues that Lukoil's business presence in the U.S. is shown by its acts in promoting gas stations as its own, and using such gas stations to "provide synergy for exporting and distributing petroleum products to the U.S. from Lukoil's production facilities."  (ECF No.

---

[26] The Trust cites to a number of exhibits but fails to specify where in those pages this information may be gleaned, and the Court will not undertake the responsibility of sifting through the pages.  *See Milton v. Daniels,* 521 Fed. Appx. 664, 668 (10th Cir. March 22, 2013); *United States v. Griebel,* 312 Fed. Appx. 93, 97 (10th Cir. April 14, 2008).

47, p. 28.)  Lukoil argues the Trust inaccurately imputes numerous alleged actions of Lukoil subsidiaries to Lukoil without correctly identifying the relevant entity at issue.  The Court agrees.

"'A holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity.'"  *Benton*, 375 F.3d at 1081 (quoting *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974)) (internal brackets omitted).  In this case, a review of the papers shows Lukoil acquired Getty Petroleum Marketing Inc. (U.S.) in 2000 and it is *Getty* which sells petroleum products through *Getty's* gasoline filing stations.  (*E.g.,* ECF No. 47-6, pp. 2, 4, 6, 7; No. 47-21, p. 1.)  The Trust cites to general case law regarding agents and alter egos but has not shown – by nonconclusory allegations or otherwise – that Getty was the agent or alter ego of Lukoil such that Getty's contacts can be attributed to Lukoil for the purposes of personal jurisdiction.[27]

Lukoil's press release did indicate that "[i]n the future, [it] may seek to supply the Getty stations with our own [Lukoil] petroleum products," but, as previously discussed, Lukoil's contacts after November 27, 2001 cannot be used to support the exercise of personal jurisdiction.  Similarly, to the extent the Trust is relying on Lukoil's activities in acquiring other gas stations in the United States, such as those from ConocoPhillips, those activities also occurred after November 27, 2001.  (ECF No. 47-23.)

---

[27] Indeed, had the Trust done so, it would serve to undermine the application of Rule 4(k)(2) to this case – *i.e.*, that Lukoil was not subject to the jurisdiction of any state's court of general jurisdiction.  According to the papers, Getty has gas stations in thirteen states.  (ECF No. 47-6, p. 2.)

The U.S. Trademarks and Marketing

The Trust argues that Lukoil's property interest in its U.S. trademarks and its open and notorious use of such trademarks in its U.S. marketing campaigns are long standing ones which establish a *prima facie* case of personal jurisdiction.  Lukoil did not address the impact, if any, of such interest.  The Court's examination of the evidence shows that all but three of such interests were applied for after 2001, and the *use* of such trademarks upon which the Trust relies occurred after 2001.[28]  (ECF No. 47-47.)  As such, the majority of the evidence concerning trademarks and their use may not be used to support the exercise of personal jurisdiction.  Instead, the issue is whether the three trademark applications are sufficient to establish "continuous and systematic" contacts in the United States.  On this record, where there is no allegation of the *use* of the trademark during the relevant time period, the Court finds it is not.  *See Decon Labs., Inc. v. Decon Labs. Ltd.*, 703 F. Supp.2d 481, 485 (E.D. Pa. 2009) (Where defendant used its trademark in the U.S., "[t]he existence of the [defendant's] trademark registered in the United States is certainly indicative of its continued presence in this country."); *General Motors Corp. v. Ignacio Lopez De Arriortua*, 948 F. Supp. 656, 666 n.9 (E.D. Mich. 1996) (plaintiff could not rely on foreign defendant's registration of trademarks in the U.S. and the filing of suits in the U.S. to protect its trademarks to subject such defendant to personal jurisdiction).  Nonetheless, the Court finds that Lukoil's three trademark applications are a factor which may be considered in determining the sufficiency of its nationwide contacts in the United States.

---

[28] The Trust also cites to *In re Latex Gloves Prod. Liab. Litig.*, 2001 WL 964105 (E.D. Pa. Aug. 22, 2001) for the proposition that use of the same corporate logo tends to support alter-ego, but provides no argument or evidence in support of the same for the relevant time period.  Therefore, any such argument will not be considered. *See, e.g., Cahill v. American Fam. Mut. Ins. Co.*, 610 F.3d 1235, 1238 (10th Cir. 2010) (court will not fill in gaps in undeveloped arguments).

The U.S. Credit Card Program

The Trust also relies on Lukoil's issuance of credit cards but has not argued or shown that such activities occurred on or before November 27, 2001. The Trust's supporting documents show no date, a copyright date of 2012, or a print date of January 7, 2010. (ECF No. 47-46; No. 47-61, p. 3; No. 47-62, p. 6.) Indeed, as such documents also reflect "Getty," these cards could not have existed until sometime after Lukoil acquired Getty in 2000. (ECF No. 47-6, p. 2.)

The U.S. Export-Import Bank Business

Here, the Trust relies on Lukoil's agreement with the Export-Import Bank of the United States ("Ex-Im Bank") and Commerzbank AG (New York branch) to provide Lukoil with millions of dollar in financing, guaranteed by Ex-Im Bank. (ECF No. 47-22.) Again, the Trust's reliance is misplaced as the papers reflect the agreement was entered into September 2002, almost a year after the date in which Lukoil's contacts may be considered for purposes of the exercise of personal jurisdiction. The argument that Lukoil must have exchanged correspondence or had other contacts in the United States leading up to the consummation of this one agreement is immaterial to the analysis. Similarly, Lukoil's use of such loan proceeds thereafter – even if in the United States – is also irrelevant.

The U.S.- Based Global Trading Business

Finally, Pan Americas' office in New York and its supply of Lukoil products to the U.S. markets also do not support the exercise of personal jurisdiction over Lukoil. First, the Trust's conclusory statement that Pan Americas is Lukoil's agent, without more, is insufficient to attribute Pan Americas' contacts to support the exercise jurisdiction over Lukoil. Next, the documents reflect that Pan Americas is affiliated with Lukoil, through which Lukoil supplies its

petroleum products to the United States.  (ECF No. 47-25; No. 47-42.)  That too, without more, is insufficient.  Finally, even assuming, *arguendo*, Pan Americas' presence – "contacts" – in the United States may be attributed to Lukoil for jurisdictional purposes, such contacts are still insufficient as they occurred after November 27, 2001.

> The Relevant Contacts in the Aggregate

The Court has also considered Lukoil's relevant contacts together in the aggregate, but also finds them insufficient to constitute a *prima facie* showing of general personal jurisdiction based on Lukoil's national contacts with the United States, as of November 27, 2001.  While such contacts support a reasonable inference that Lukoil was intending to conduct additional business in the U. S. in the future, it cannot be said that Lukoil was essentially "at home" in the United States by that date.

### (2) Minimum Contacts – Specific Jurisdiction

Aa previously discussed in analyzing specific jurisdiction under a state's long-arm statute, "[a] specific jurisdiction analysis involves a two-step inquiry."  *Benton*, 375 F.3d at 1075.  First, the court must consider "whether the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there," *i.e.,* the defendant has sufficient minimum contacts.  *Id.* (internal quotation marks omitted).  Second, if the defendant's actions create sufficient minimum contacts, the court must consider "whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice."  *Id.* (internal quotation marks omitted).  To establish sufficient minimum contacts, the court must ask whether (1) the defendant "purposefully directed" its activities at the forum state; and (2) the plaintiff's claims result from injuries that "arise out of or relate to" those

activities.  *Dudnikov,* 514 F.3d at 1071, 1078; *Benton,* 375 F.3d at 1075.  In the context of Rule 4(k)(2), the relevant forum, however, is not Colorado but, rather, the United States.  *Synthes,* 563 F.3d at 1296; *Pandaw America,* 842 F. Supp.2d at 1311.

The Trust argues it has established numerous direct contacts by Lukoil *itself*, relying on the contacts previously discussed in addressing general jurisdiction, *e.g.,* the ADRs and the registration of trademarks, as well as Lukoil's alleged fraudulent communications to Archangel while it was located in Colorado.[29]  The Court agrees, even if Lukoil's contacts ceased to be jurisdictionally relevant as of November 27, 2001.  Lukoil's actions in opening an office in New York, sponsoring ADRs to be sold in the United States, applying to register its trademarks in the United States, and sending one letter to Archangel in Colorado are sufficient to support that Lukoil "purposefully directed" its activities at the United States and its residents.  *See Pinker*, 292 F.3d at 371 (Foreign defendant subject to specific jurisdiction as "[t]he aim of sponsoring an ADR, after all, is to allow American investors to trade equities of a foreign corporation domestically.")  Thus, the Trust satisfies the first prong.

The Court finds, however, that the Trust cannot satisfy the second prong – that the plaintiff's claims result from injuries that "arise out of or relate to" those activities.  All but one of the contacts relied upon have no connection with the Trust's claimed injuries – the loss of its interests in the Russian diamond mine and Diamond License, and the millions of dollars Archangel contributed to acquire and develop such interests.  The one letter, standing alone, is insufficient to support the years of conduct which the Trust has placed into issue as the bases for

---

[29] An examination of the Complaint shows only one such direct communication.  All others were allegedly made through Lukoil's subsidiary AGD.  (Complaint, *e.g.*, ¶¶ 52, 91c.)  To the extent that the Trust also seeks to rely on any contacts by DSE, Lukoil-AIK, Lukoil Israel, Oldberry and Gilwood, the DDC has already decided that they were not Lukoil's agents or alter egos.  (ECF No. 29-8.)  Accordingly, the Trust is precluded from relitigating that issue or arguing otherwise.

its claims and alleged damages, most of which occurred in Russia and Canada before Archangel moved to Colorado. Accordingly, the Trust has failed to establish sufficient minimum contacts for specific jurisdiction.

### (3) The *Peay* Factors

Even if this Court found Lukoil made a *prima facie* case of general or specific personal jurisdiction based on Lukoil's national contacts, the Court would still have to examine the *Peay* factors to determine whether the exercise of jurisdiction would be "fair and reasonable." *Peay*, 205 F.3d at 1212.[30] "A defendant's 'minimum contacts' with the United States do not … automatically satisfy the due process requirements of the Fifth Amendment." *Republic of Panama*, 119 F.3d at 947. "[E]ven if a defendant has 'minimum contacts' with the forum [here, the United States], due process is not satisfied unless 'the assertion of personal jurisdiction would comport with fair play and substantial justice.'" *Peay*, 205 F.3d at 1212 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). The burden, however, shifts to the defendant, Lukoil. "The burden is on the defendant to show that the exercise of jurisdiction in the chosen forum will 'make litigation so gravely difficult and inconvenient that he unfairly is at a severe disadvantage in comparison to his opponent.'" *Peay*, 205 F.3d at 1212 (quoting *Burger King Corp.,* 471 U.S. at 478) (internal brackets omitted).

---

[30] In *Daimler*, in discussing the two-prong due process analysis, the Supreme Court noted that "[w]hen a corporation is genuinely at home in the forum State … any second-step inquiry would be superfluous," *Daimler*, 134 S.Ct. at 762 n.20, raising an issue as to the "necessity" of conducting such an inquiry in evaluating general personal jurisdiction. Nonetheless, the Supreme Court went on and considered the "fair play and substantial justice" due process demands in light of the transnational context of the dispute at issue. *Daimler*, 134 S.Ct. at 763. Moreover, the issue before this Court arises under Rule 4(k)(2), and the Trust has argued Lukoil is subject not only to general jurisdiction but also to specific jurisdiction.

In evaluating whether the defendant has met its burden, the following factors are considered:

> (1) the extent of the defendant's contacts with the place where the action was filed; (2) the inconvenience to the defendant of having to defend in a jurisdiction other than that of his residence or place of business, including (a) the nature and extent and interstate character of the defendant's business, (b) the defendant's access to counsel, and (c) the distance from the defendant to the place where the action was brought; (3) judicial economy; (4) the probable situs of the discovery proceedings and the extent to which the discovery proceedings will take place outside the state of the defendant's residence or place of business; and (5) the nature of the regulated activity in question and the extent of impact that the defendant's activities have beyond the borders of his state of residence or business.

*Peay*, 205 F.3d at 1212.  The Tenth Circuit has emphasized "that it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern," as "in this age of instant communication, . . . and modern transportation, the burdens of litigating in a distant forum have lessened."  *Peay*, 205 F.3d at 1212-1213 (internal quotation marks, brackets and citations omitted).

Lukoil essentially argues the Court can dispense with consideration of these factors because the Colorado state courts found it was constitutionally burdensome or unreasonable to exercise personal jurisdiction over Lukoil.  The Colorado courts, however, did not consider the constitutional reasonableness under the Fifth Amendment.

Defendant's contacts with the place where the action was filed.  *Peay* involved a domestic non-resident defendant, but Lukoil is a foreign defendant.  Although the Court has found that it is national contacts which are controlling for purposes of determining minimum contacts, it also finds that some consideration should be made as to the contacts within the chosen forum, *i.e.*, state.  As shown by the evidence, Lukoil did have at least one direct contact

with Colorado – the Trust specifically alleged that on April 3, 1998, Lukoil wrote a letter to Archangel, lulling Archangel into believing that AGD would honor the Agreement.  (Complaint, p. 15, ¶¶52-53.)  However, in light of the nature of the Illegal Scheme alleged, and the years at issue, the Court finds that this one contact does not support a finding of reasonableness.[31]

Inconvenience to Defendant.  Lukoil – even by 2001 – was undisputedly a large company who did some business in the United States, such as opening an office in New York, applying to register its trademarks, and sponsoring ADR-1s.  Further, Lukoil has counsel here in Colorado and, as is apparent from the trademark applications, counsel elsewhere to assist in its legal affairs.  As for the distance from Russia to Colorado, the Court takes judicial notice that Russia is very far from Colorado, even under today's modern methods of international travel and communications.  "[T]he burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction."  *See OMI Holdings, Inc.,* 149 F.3d at 1096.  "When the defendant is from another country, . . .'great care and reserve should be exercised' before personal jurisdiction is exercised over the defendant."  *OMI Holdings,* 149 F.3d at 1096 (quoting *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 114 (1987)).  Accordingly, this factor also favors a finding of unreasonableness.

Judicial Economy.  No evidence was presented on this issue.  As such, Lukoil has not shown this factor supports unreasonableness.

---

[31] In addition, to the extent the Trust relies on AGD's contacts to support reasonableness, its conclusory allegations that Lukoil directed communications to Colorado are insufficient.  Further, even if the Court were to credit such communications, the quality and quantity of such contacts are also insufficient.

<u>Probable Situs of Discovery Proceedings</u>

The dispute between Lukoil and the Trust, to which the Trust claims damages, arises from Lukoil's participation in the alleged Illegal Scheme to deprive Archangel of its interest in a Russian diamond mine and Diamond License, in breach of an Agreement made between AGD's predecessor in Russia and Archangel's predecessor in Canada.  On this record, discovery will take place in Colorado, Russia, Canada, and elsewhere.  (*E.g.,* ECF No. 29-14, ¶15.) Nonetheless, discovery will overwhelmingly be in Russia as that is where the diamond mine is located, where the Diamond License was issued, and where Lukoil and AGD, a non-party, and their management and employees allegedly involved in the Illegal Scheme are located.[32]  (ECF No. 29-14, pp. 4, 5.)  Further, such individuals speak primarily Russian.  (ECF No. 29-14, p. 4.) Based on the record, Lukoil's documents are primarily written in Russian.  While the Trust's claims against Lukoil are not for breach of contract, the Agreement is at the heart of the parties' dispute and its enforceability will nonetheless be at issue.  During the Stockholm Arbitration, Archangel agreed that the Agreement would be subject to Russian law.  In addition, the Trust alleges in this case that the transferability of the Diamond License is governed by Russian law. Lukoil has also represented that the Russian nonparty witnesses, *e.g.*, AGD's management and employees, are not subject to compulsory attendance should the case be heard in Colorado, and the Trust has not argued otherwise.

On the other hand, the Trust is located here and the Trustee is a Colorado resident. Archangel is a Canadian corporation and its management and employees involved are located in

---

[32] In light of the context under which Lukoil's Rule 26 disclosures were made, and the allegations in the Complaint, the Court is not persuaded by the Trust's argument that Lukoil's witnesses will consist only of those identified in its initial disclosures.

Canada and speak English.  Two key witnesses, however, are in Colorado, but are no longer

employed by Archangel and would not voluntarily appear for a deposition or trial.  It also

appears that one witness is in Australia.  (ECF No. 47-66.)  The Trust's and Archangel's

documents are in English and would have to be translated into Russian.  Further, the Trust's

claims are for RICO, COCCA and based on state law.  The Trust's damages, however, consists

of not only what Archangel allegedly invested while in Canada and Colorado but also lost profits

based on the valuation of the Russian diamond pipes that it contends are within the scope of the

Diamond License.  (ECF No. 47-70, pp. 6-7.)  On this record, as between Colorado and Russia,

the Court finds Russia is the more efficient forum as that is where the diamond pipes are located,

where the Diamond License was issued, where Archangel sent its funds to be used, and where

the majority of the acts which serve as the bases for the RICO claims allegedly occurred.

<u>The Regulated Activity at Issue</u>

The Trust alleges Lukoil acquired ownership of AGD and thereafter operated and

managed the Illegal Scheme designed to defraud Archangel out of its interest in the Russian joint

venture and the rights thereunder, *i.e.*, the Russian Diamond License, while lulling Archangel

into investing millions of dollars into the venture.  Archangel is a Canadian company, and the

overwhelming bulk of the funding it provided to the diamond venture occurred before Lukoil

acquired an interest in AGD, and the majority of the illegal acts alleged had no contact to

Colorado.  When Lukoil allegedly first reached out to lull Archangel into investing *additional*

funds, however, Archangel had already moved its principal place of business to the United States

– Colorado.  Thus, the United States has some interest in resolving this case.  *See Goodwin v.*

*Bruggeman-Hatch*, 2014 WL 3882183, at * 9 (D. Colo. August 7, 2014).  This factor slightly favors a finding of reasonableness.

Weighing the Factors

The Supreme Court has cautioned the courts that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi*, 480 U.S. at 115 (internal quotation marks omitted).  In light of the international nature of this dispute, and after weighing the above factors, the Court finds that the burden on Lukoil of defending this case in the United States is undue and unreasonable.[33]

## V.  REQUESTS TO CONDUCT DISCOVERY AND AMEND

## A.    MOTIONS FOR DISCOVERY

The Trust has filed two motions seeking discovery to support the exercise of personal jurisdiction over Lukoil.  (ECF Nos. 41, 43.)  "When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion."  *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002) (internal quotation marks omitted).  The trial court, however, has broad discretion in determining whether to permit jurisdictional discovery.  *Id.*  In this case, the Court finds that the requested discovery is unwarranted for at least three reasons.[34]

First, the majority of the information which the Trust seeks appears to be for time periods beyond those which are relevant to the jurisdictional analysis.  Next, the information is for use in establishing minimum contacts, but this Court has found that even if the Trust establishes Lukoil

---

[33] Neither party argues whether the Court should address the next factor – "if the federal interest in litigating the dispute in the chosen forum outweighs the burden imposed on the defendant."  *Peay*, 205 F.3d at 1213.  As such, it will not be considered.

[34] Magistrate Judge Michael J. Watanabe previously denied the Trust's motions for jurisdictional discovery.  The Court, however, construes the Trust's Response as containing a separate request for jurisdictional discovery.

had sufficient minimum contacts, the exercise of jurisdiction would not be "fair and reasonable." The Trust's footnote that the discovery would also be relevant to rebut Lukoil's assertion that the exercise of jurisdiction is unconstitutionally unreasonable is simply too conclusory. (ECF No. 43, p. 25 n.13.) Finally, as discussed below, the Court finds that dismissal is proper for *forum non conveniens* independent of whether dismissal may be warranted for lack of personal jurisdiction. Thus, upon considerations of judicial economy, the Court declines to reach the issue of whether some of the requested discovery was otherwise appropriate or might have revealed additional contacts during the relevant time period sufficient to establish personal jurisdiction. Allowing discovery would unduly cause delay and expense "all to scant purpose" as this Court would inevitably dismiss this case for *forum non conveniens*. *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 435 (2007).

**B.     REQUEST TO AMEND**

The Trust seeks leave to amend its Complaint to cure any pleading deficiencies in the event this Court finds the Trust's allegations insufficient as to its RICO claims. (ECF No. 100, p. 169.) As the Court did not reach the issues relating to the sufficiency of the Trust's pleading as to its RICO claims based on the alleged Illegal Scheme, and the Trust submitted no proposed pleading for the Court's consideration, this request is denied.

## VI. *FORUM NON CONVIENENS*

Even if Lukoil is subject to personal jurisdiction in the United States and may properly be haled before this Court in Colorado, Lukoil argues this case should nonetheless be dismissed based on *forum non conveniens*. Lukoil also argues the Court can determine this issue as a threshold matter without a jurisdictional determination, and find that dismissal is proper upon

examination of the *forum non conveniens* factors.  After careful consideration of the issue, the Court agrees.[35]

Under the *forum non conveniens* doctrine, "'when trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to the plaintiff's convenience, or when the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems, the court may, in the exercise of its sound discretion, dismiss the case, even if jurisdiction and proper venue are established.'"  *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1172 (10th Cir. 2009) (quoting *Am. Dredging Co. v. Miller,* 510 U.S. 443, 447-448 (1994)); *see Fireman's Fund Ins. Co. v. Thyssen Mining Constr. of Canada, Ltd.*, 703 F.3d 488, 494 (10th Cir. 2012).  Where the only alternative forum is a foreign country, the court should apply a two-step test to determine whether a case may be dismissed under the *forum non conveniens* doctrine.  "First, there must be an adequate alternative forum in which the defendant is amenable to process."  *Fireman's Fund*, 703 F.2d at 495 (internal quotation marks omitted).  The alternate forum must also be available.  *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 606 (10th Cir. 1998), *cert. denied*, 526 U.S. 1112 (1999).  "Second, the court must confirm that foreign law is applicable."  *Fireman's Fund*, 703 F.2d at 495.  If the answer to either question is no, the *forum non conveniens* doctrine is inapplicable.  *Id*.  If the answer to both questions is yes, the court then weighs the private and public interest bearing on the *forum non conveniens* decision.  *Yavuz,* 576 F.3d at 1172.

---

[35] The Supreme Court has indicated that "once a court determines that jurisdiction is lacking, it can proceed no further and must dismiss the case on that account."  *Sinochem Int'l Co. Ltd.*, 549 U.S. at 434.  Notwithstanding this caution, the Court proceeds with this issue for two reasons.  First, because this issue is closely related to the issue of the constitutional reasonableness of exercising jurisdiction over Lukoil.  Second, and more importantly, because the parties have been litigating these issues since 2001 before the Colorado state trial and appellate courts and back again.  In light of this history, the Court finds that in the interest of securing the just, speedy and inexpensive determination of every action, it is in the best interests of the parties for this issue to also be resolved.

A.      **TIME PERIOD FOR ASSESSING *FORUM NON CONVENIENS***

The first issue the Court must decide is the time period for determining whether dismissal is appropriate.  Neither party addressed whether the time period for evaluating the *forum non conveniens* factors should be 2001, 2012, or some other time.  The parties' arguments rely on matters existing at the time the action was filed in the Colorado state court and thereafter, indicating the Court should do the same.  This view is supported by *Fireman's Fund* where the Tenth Circuit determined that the trial court's dismissal under *forum non conveniens* was premature because there was a matter pending which would impact whether there was an adequate alternate forum available to the plaintiff.  *Fireman's Fund*, 703 F.3d at 496. [36]  In fact, *Fireman's Fund* supports the proposition that the alternate forum must be available not only "presently" but also when the plaintiff's case is refiled before that alternate forum.  *Fireman's Fund*, 703 F.3d at 496; *see In re Air Crash Disaster Near New Orleans*, 821 F.2d 1147, 1166 & n.31 (5th Cir. 1987), *vacated on other grounds, Pan American World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989) ("The status of the case when a forum non conveniens motion is *decided* is the most significant in the resolution of the motion.") (emphasis added); *Taylor v. Tesco Corp.*, 754 F. Supp.2d 840, 844 n.3 (E.D. La. 2010) (same).  Although the case before this Court has an additional twist because it was brought under the Colorado savings statute, the Court nonetheless finds this principle controlling.

The next issue the Court must decide is whether the moving party – here, Lukoil – has shown dismissal is warranted.  *E.g., Fireman's Fund*, 703 F.3d at 496; *see Rivendell Forest*

---

[36] In addition, "'[i]n modern litigation, there is generally no time limit on when a motion to dismiss for *forum non conveniens* must be made,'" *Yavuz*, 576 F.3d at 1173 (quoting 14D Charles Alan Wright et al., Federal Practice and Procedure § 3828 (3d ed. 2008)), supporting the proposition that events subsequent to the filing of an action may be relevant.

*Prods., Ltd. v. Canadian Pacific Ltd.*, 2 F.3d 990, 993 (10th Cir. 1993).  An examination of the relevant factors show Lukoil has done so.

**B.    AVAILABLE AND ADEQUATE ALTERNATIVE FORUM**

**1.  The Trust is not a Foreign Plaintiff**

Where the chosen forum is the plaintiff's home forum, there is a strong presumption in favor of hearing the case.  *See Gschwind*, 161 F.3d at 606.  Lukoil argues that the Trust's choice of forum – Colorado – should be given no deference because Archangel is not a U.S. citizen and because it chose to invest in a foreign country where the acts complained of occurred primarily.  Lukoil's argument may carry more weight if Archangel is the plaintiff and AGD is the defendant.  But, such is not the case.  Here, at the time the Colorado state court action was filed, Archangel's principal place of business was in Colorado.  Thereafter, Archangel filed bankruptcy in Colorado and Archangel's successor-in-interest is the Colorado Trust, with a Colorado trustee.  It is the Trust who has been and still is the plaintiff in this case.  Further, while Archangel chose to do business in Russia with AGD, it did not do so as to Lukoil.  According to the Trust's allegations, it was Lukoil who reached into Colorado to persuade Archangel to invest further funds in reliance on the representation that AGD would transfer the Diamond License.  And, while Archangel did indeed choose to do business with a Russian entity (AGD), it bargained for disputes to be decided by a Swedish tribunal, not a Russian one.  Finally, the fact that Archangel is no longer in Colorado is of no consequence where it is alleged that Archangel's move back to Canada was occasioned by AGD's and Lukoil's wrongful actions.  Under these facts and allegations, there is a strong presumption in favor of hearing this case in Colorado, the Trust's chosen forum.

Lukoil also contends less deference should be afforded to the Trust's choice of forum as the Trust/Archangel has engaged in forum shopping.  While Archangel's actions lend support to Lukoil's contention of forum shopping between a state or federal court in Colorado, there is no evidence of forum shopping as between Colorado or any other forum in the U.S. or otherwise, especially as against Lukoil.  Instead, the records show that Archangel attempted to arbitrate in Sweden against AGD and Lukoil, to which Lukoil successfully argued it was not subject to that tribunal's jurisdiction.  (ECF No. 47-48, p. 1; No. 29-20, p. 3, ¶¶13, 16.)  Accordingly, substantial deference is given to the Trust's choice of forum.

### 2.  Russia is an Available Forum

Lukoil argues that Russia is an available forum as it has consented to the jurisdiction of the Russian courts and agreed not to invoke the statute of limitations defense there.  The Court agrees.  *Gschwind*, 161 F.3d at 606 ("[Defendants'] concession [to suit in the alternate forum] is generally enough to make the alternate forum available."); *cf. Fireman's Fund*, 703 F.3d at 488 (availability of an alternate forum unclear where plaintiff's claim may be barred by the statute of limitations in the alternate forum).

### 3.  Russia  is an Adequate Alternate Forum

"[W]hen dismissal in favor of a foreign forum creates a danger that the plaintiffs will be deprived of any remedy or the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all," "dismissal may not be in the interests of justice." *Fireman's Fund*, 703 F.3d at 495 (internal quotation marks, citations, and brackets omitted).  In other words, "[i]f the remedy provided by the foreign forum is 'clearly unsatisfactory, the other forum may not be an *adequate* alternative, and the initial requirement may not be satisfied.'"

*Fireman's Fund*, 703 F.3d at 495 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22 (1981)) (emphasis in original).  In such a case, "an inconvenient forum is the *only* available forum."  *Id*. (emphasis in original).  "[T]he remedy provided by the alternate forum[, however,] need not be the same as that provided by the American court."  *Yavuz*, 576 F.3d at 1174 (internal quotation marks omitted).  Thus, the foreign forum is not inadequate because it does not provide punitive damages, or provide for the same substantive claims, such as RICO.  *Yavuz*, 576 F.3d at 1177 & n.6.  Nor must the foreign forum have the same procedural safeguards.  *Yavuz*, 576 F.3d at 1177.

To support its argument that Russia is an adequate forum, Lukoil relies on its expert witness Professor Paul B. Stephan III.  In his Declaration, Professor Stephan opines that Russia's courts would have jurisdiction over the Trust's claims; Russia's courts provide significant procedural safeguards, including allowing for the discovery of evidence; Russian law permits similar relief as those sought here, including illegal interference with contract and fraud, but it is unknown whether a RICO claim may be brought; Russia's courts may award the compensatory type of damages sought by the Trust; and the Russian court system provides for appellate court review and certiorari-type reviews.  (ECF No. 29-18.)  Lukoil also relies on the proposition that the alternate court need not offer every specific cause of action that a plaintiff asserts or every remedy, *i.e.,* punitive damages, and other U.S. Courts have recognized the Russian Federation as an adequate forum.

On the other hand, the Trust relies on the opinion of its litigation funder, James Passin, that no investor would provide litigation funding for this case against Lukoil if it were to be litigated in Russia because of concerns over influence and corruption in Russian courts.

According to Mr. Passin, the dismissal of this case to Russia would be its "death knell" due to the Trust's financial difficulties.  (ECF No. 47-67, ¶12.)  In other words, for the Trust, Russia is not an adequate alternate forum.

The Trust cites to no authority which specifically supports the proposition that the plaintiff's inability to fund litigation in the proposed alternate forum is a factor to consider in evaluating whether there is an adequate alternate forum for purposes of *forum non conveniens*. However, in *Omni Holdings*, in the context of evaluating reasonableness under the due process clause, the Tenth Circuit indicated that in assessing whether the plaintiff may receive convenient and effective relief in another forum, the court may consider whether litigating in the other forum would be a burden "so overwhelming as to practically foreclose pursuit of the lawsuit."  *Omni Holdings*, 149 F.3d at 1097.  Further, in *Rivendell*, the Tenth Circuit stated that a transfer which primarily serves to merely shift the costs from defendant to plaintiff is not a permissible basis for a *forum non conveniens* dismissal.  *Rivendell*, 2 F.3d at 994 n.7.  However, "[t]he shifting of costs…may be a relevant consideration in granting dismissal" "when the moving party has substantially fewer financial resources than the non-moving party."  *Id*.  Thus, this factor may be a relevant consideration.  However, the Court finds that such consideration is more properly addressed as part of the private interest factors.  Accordingly, the Court finds that Lukoil has shown that the Russian courts are an adequate alternative forum, in light of Lukoil's voluntary consent to the jurisdiction of such courts and forbearance in raising the statute of limitations as a defense in that forum.

### 4. Domestic or Foreign Law

If domestic law applies, the *forum non conveniens* doctrine is inapplicable. *Rivendell*, 2

F.3d at 993 n.4. However, even if foreign law applies, "this factor alone is not sufficient to

warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum

is appropriate." *Rivendell*, 2 F.3d at 994. To the extent not agreed to by the parties or otherwise

already established, the court conducts a conflicts-of-law analysis to determine which law

applies to the controversy. *See Yavuz*, 576 F.3d at 1178-1179.

Lukoil argues Russian law applies to this case because the DDC so determined, and

Archangel admitted in the Stockholm Arbitration that Russian law applied to its dispute with

AGD, and then subsequently argued in the arbitration proceedings that Swedish or other law

applied, but not U.S. law. The Court is not persuaded that only Russian law applies to the

parties' controversy.

First, Lukoil fails to show where in the DDC's opinion it states that Russian law should

govern the Trust's dispute, and the Court's review of the opinion shows no conflicts of law

analysis to reach such a conclusion. Next, Lukoil has not shown how or why Archangel's

agreement or admission that Russian law applies to its dispute with *AGD* results in the

conclusion that such law applies to its entire dispute with *Lukoil*. The Trust's claims against

Lukoil are statutory or based in tort. Nonetheless, the papers show the validity or enforceability

of the Agreement between Archangel and AGD will be at issue,[37] and, therefore, Russian law

will be at issue.[38] In addition, it appears the transferability of the Diamond License may be at

---

[37] Professor Stephan's Declaration states that Lukoil has twice sought to invalidate contracts to which Archangel is a party. (ECF No. 29-18, p. 21, ¶41.)
[38] Unless the Trust can successfully argue that Swedish or some other *foreign* law applies notwithstanding its earlier admission.

issue, which also raises questions of Russian law.  That begs the question, however, of what other law applies as to the Trust's claims against Lukoil, with or without the statutory claims. Here, Lukoil has not shown that Russian law applies to the entire controversy.  But the Court finds that Russian law applies to a significant part of the parties' dispute.

### 5.  Private Interests

The Court must also balance the private and public interest factors as between the two alternative forums – Colorado and Russia.  The private interest factors a district court must consider include: "'(1) the relative ease of access to sources of proof; (2) availability of compulsory process for compelling attendance of witnesses; (3) cost of obtaining attendance of willing non-party witnesses; (4) possibility of a view of the premises, if appropriate; and (5) all other practical problems that make trial of the case easy, expeditious and inexpensive.'"  *Yavuz*, 576 F.3d at 1180 (quoting *Gschwind*, 161 F.3d at 606).

Relying on the Affidavit of Boris Zubkov, the head of Lukoil's corporate law unit, Lukoil argues that these private factors weigh in its favor.  Specifically, Mr. Zubkov stated that Lukoil's management and employees are in Russia and speak primarily Russian; AGD's and Lukoil's witnesses are in Russia and other foreign countries around the world; AGD is a Lukoil subsidiary that conducts its business and maintains its documents in Russia, and whose management resides in Russia; and if this case was litigated in the U.S., Lukoil would be required to travel extensively to the U.S. and would incur great expense.  Other than argument, Lukoil presented no competent evidence that any non-party witnesses could not be compelled or would not be willing to attend trial is the U.S.  Nonetheless, the Trust has not argued otherwise.

Based on the allegations in the Complaint and Lukoil's Initial Rule 26(a)(1) Disclosures, it appears that most of Lukoil's witnesses are employees or management of Lukoil or its subsidiary AGD and most documents would be in their possession or control.  At least two of Lukoil's witnesses are located in the United States.  Other foreign witnesses' locations are undisclosed and it is unknown whether it would be more expensive for them to travel to the U.S. as opposed to Russia.  There is also insufficient evidence to support a determination of whether these foreign witnesses could be compelled to testify in Russia, or would voluntarily appear in Russia, but not the U.S.  Nonetheless, the submissions and Mr. Zubkov's Affidavit, however, show that Lukoil's and AGD's documents are likely to be written in Russian.

On the other hand, Archangel is a Canadian corporation, but its claims against Lukoil arise from communications to and from Russia and Colorado.  Further, the plaintiff is the Trust and Archangel's documents are here in the U.S.  (ECF No. 47-1, ¶94.)  Nonetheless, such claims also involve extensive prior communications between Archangel and AGD to and from Russia and Canada.  The Trust's documents are in English or have been translated into English, and litigating this case in Russia would require the translation of documents from English to Russian.  Except for one key witness located in Australia who speaks Russian, the Trust's other key witnesses speak English.  Two of the Trust's key witnesses are located in Colorado.  Other key witnesses are located in New York, Canada, the United Kingdom, and Australia.  Except for Mr. Krel, none of the Trust's witnesses in the West have agreed to testify in Russia.  (ECF No. 47-1, ¶¶89-93.)

After considering all the private factors, the Court finds that moving this lawsuit to Russia would, for the most part, be simply be shifting the burden of litigation from Lukoil to the

Trust.  If the case was heard here, documents would need to be translated into English, Russian

interpreters would be necessary, and the parties appear not to dispute that this Court would likely

not be able to compel non-party witnesses to appear.  If the case was heard in Russia, documents

would have to be translated into Russian, English interpreters would be needed, and, again, the

parties appear not to dispute that the Russian courts could not compel non-party witnesses to

appear.  Litigation would be more expensive for one party or the other, depending on the forum.

Nonetheless, the Trust also contends that litigating in Russia would, for all practical purposes, be

the "death knell" of this case as its litigation funders would be unwilling to fund a lawsuit in

Russia.  While a party's financial resources may be a relevant consideration, the Court is less

convinced that the possible actions of present or future investors are relevant considerations.[39]

Nonetheless, the Court finds these interests weigh slightly in favor of the Trust.

### 6. Public Interests

The public interest factors include: "(1) administrative difficulties of courts with

congested dockets which can be caused by cases not being filed at their place of origin; (2) the

burden of jury duty on members of a community with no connection to the litigation; (3) the

local interest in having localized controversies decided at home; and (4) the appropriateness of

having diversity cases tried in a forum that is familiar with the governing law." *Yavuz*, 576 F.3d

at 1180 (quoting *Gschwind*, 161 F.3d at 606).

Lukoil argues these factors favor a transfer.  The Court agrees.  First, this case will pose

significant administrative difficulties to the District of Colorado in terms of time and energy in

handling the many issues that will likely arise, including obtaining Russian interpreters for trial,

---

[39] To date, apparently two different entities have provided litigation funding for Archangel/the Trust at different times.  (Complaint, ¶68 (companies associated with DeBeers); ECF No. 47-67 (an affiliate with Firebird).)

applying Russian law to issues relating to the Agreement and Diamond License, and assisting the parties in their efforts to obtain witnesses for deposition or trial.  Next, this case does have connections to Colorado as this is where Archangel filed bankruptcy, where the Trust is located and where Archangel had its principal place of business until it was allegedly force to move back to Canada.  Nonetheless, the Trust's claims and resulting damages arise from the alleged loss of its investment and interest in a Russian diamond mine and Diamond License, through the conduct of Russian companies located in Russia, and where most of the conduct complained of occurred while Archangel was in Canada.  Thus, the dispute has much closer connections and greater interest to Russia.  Similarly, although the Trust seeks damages and not the transfer of the Diamond License, the litigation necessarily will require the determination of whether there was a contract (the Agreement) between AGD and Archangel for the transfer of the Diamond License to a joint venture in which Archangel has an interest.  *See Harris Group, Inc. v. Robinson*, 209 P.3d 1088, 1195 (Colo. App. 2009) (setting forth the elements for intentional interference with contract claim under Colorado law).[40]  Moreover, although the Trust is not seeking the transfer of the Diamond License, its transferability will likely also be at issue.  These issues are ones in which Russia has a strong interest in resolving by its courts.  Finally, Russia certainly has an interest in interpreting and applying its laws to the Agreement and Diamond License, laws in which this Court is unfamiliar.  Accordingly, the Court finds the public interest factors weigh heavily in favor of dismissal.

---

[40] Professor Stephan indicated Russian law provided means for compensating injuries caused by illegal interference with contract (ECF No. 29-18, p. 19, ¶34); therefore, the Court assumes for the purposes of this analysis that a valid contract would also be a prerequisite to this type of claim in Russia.

**7. Summary**

In summary, Russia is an available and adequate alternate forum to hear this case.  If the case were heard here, foreign law would apply at least to part of the controversy between the parties.  And, while the private interests weigh slightly in favor of the Trust, the public interests weigh heavily in favor of Lukoil.  On this record, the Court finds that Lukoil has met its heavy burden of showing that dismissal under *forum non conveniens* is appropriate, in light of Lukoil's affirmative representation to this Court that it consents to the jurisdiction of the Russian courts and agrees not to raise the statute of limitations as a defense to the Trust's claims.

## VII.  CONCLUSION

In light of the Court's determinations on the issues addressed, it need not decide the other issues raised by the parties.

Based on the foregoing, it is ORDERED that:

1.  Defendant Lukoil's Motion to Dismiss (ECF No. 29) is hereby GRANTED based on:

    a.  lack of personal jurisdiction over Defendant Lukoil;

    b.  the doctrine of *forum non conveniens*, in light of Defendant Lukoil's affirmative representation that it consents to the jurisdiction of the Russian courts and it will not raise the statute of limitations defense, and on which this dismissal is so conditioned;

2.  The Trust's request for leave to amend is hereby DENIED; and

3.   All other pending matters are DENIED as moot.

DATED this 18th day of December, 2014.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge